United States Court of International Trade
One Federal Plaza
New York, NY 10278



CHAMBERS OF
Gary S. Katzmann
JUDGE

April 15, 2021

David L. Simon
Law Office of David L. Simon
1025 Connecticut Avenue, NW, Suite 1000
Washington, DC 20036

Ann C. Motto
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Washington, DC 20044

John R. Shane
Wiley Rein, LLP
1776 K Street, NW
Washington, DC 20006

**Re:**   **Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States**
Court No. 20-00065
Questions for Oral Argument

Dear Counselors:

    In light of the current COVID-19 pandemic, oral argument in this case will be held remotely via WebEx, in lieu of a proceeding at the courthouse, on Wednesday, May 19, 2021 at 9:30 a.m.  The court will provide dial-in information to the parties.  Information on how the public can listen to open proceedings can be found on the court's website under "Upcoming Court Proceedings Accessible via Teleconference" (https://www.cit.uscourts.gov/upcoming-court-proceedings-accessible-teleconference).  The argument, if public and not closed, will be recorded and made available to the public via the court's website.  If you will be requesting a closed argument or portions of the argument, please inform my case manager, Geoffrey Goell, no later than close of business, Monday, May 17, 2021.  The court encourages the parties to maintain a public argument, if possible.

The court has examined the parties' briefs and documents and would like counsel to submit answers in writing to the court's questions for oral argument by close of business on Tuesday, April 27, 2021. Parties shall file public and, if necessary confidential, versions of their answers, of not more than fifteen pages. The oral argument shall be dedicated primarily to rebuttal arguments to the answers filed by opposing counsel on Tuesday, April 27, 2021. The court will also permit but not require brief opening statements. Presentations shall not exceed twenty (20) minutes by the plaintiff and twenty (20) minutes shared by the defendant and defendant-intervenor.

**I.    Questions to Plaintiff Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.Ş.**

1.  The court previously upheld a determination by Commerce that Russian natural gas exports distorted EU pricing data where Russian natural gas comprised 39.5% of EU natural gas imports. Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States, 44 CIT __, 459 F. Supp. 3d 1341 (2020). Is the difference between 39.5% and 32.8% sufficient to require a finding that Russian exports are no longer distortive?

    a.  How does the evidence underlying Commerce's analysis of the distortive nature of Russian natural gas prices in this case differ from that at issue in, for example, Rebar Trade Action Coalition v. United States, 43 CIT __, 398 F. Supp. 3d 1374 (2019), where the court found that substantial evidence supported Commerce's determination that Russian natural gas prices were distorted?

2.  Assuming Commerce is not obligated to select a benchmark employing the same units of measurement as Habaş's purchases from Botas, is it also precluded from determining that a proposed dataset is unreliable based on the units of measurement in combination with other factors?

3.  Please identify the record evidence supporting your contention that the Comtrade and Eurostat data were not converted into kilograms from any other units when the data were originally collected and reported.

    a.  Is it your position that Commerce must affirmatively demonstrate that the data were initially recorded in a unit other than kilograms in order to reject the data?

4.  Is it your position that Eurostat's explanation of its collection methodology is also a sufficient explanation for the collection methodology employed in the Comtrade data?

    a.  How do you respond to RTAC's argument that the cited Eurostat report does not explain Eurostat's collection methodology because it is instead a "report on the general nature of recent energy trade" and only presents data on a "'net mass' basis"? See Def.-Inter.'s Resp. Br. at 9–10, Nov. 10, 2020, ECF No. 27.

5.  Which statutory or regulatory authority requires Commerce to consider product similarity when selecting the data to use for a tier-three benchmark determination?

    a.  Under 19 C.F.R. § 351.511, is it your position that the requirement for product similarity to be considered in tier-one and tier-two benchmark determinations, extends to a tier-three determination? See 19 C.F.R. § 351.511(a)(2)(i)–(iii).

6. The Government explains that Commerce adjusted the record data to account for (and remove) the presence of liquified natural gas imports. Def.'s Resp. to Pl.'s Mot. for J. on the Agency R., Nov. 10, 2020, ECF No. 26 ("Def.'s Br."). Why is the adjustment of the IEA data not sufficient to avoid distortion?

7. Is it your position that Commerce's adjustments to the IEA data only made the data less accurate and thus less reliable for a tier-three benchmark determination?

8. What cases and authorities best support your argument?

9. Are there any recent or pending Federal Circuit or CIT cases that may change the analysis?

II. **Questions to Defendant the United States ("the Government") and Defendant-Intervenor Rebar Trade Action Coalition ("RTAC")**

1. How do you respond to Habaş's argument that its statistical analysis of Russian export pricing, and conclusion that Russian export prices are in fact market-driven, meaningfully distinguishes this review from <u>Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of CVD Administrative Review; 2016</u>, 84 Fed. Reg. 36,051 (Dep't Commerce July 26, 2019)? <u>See</u> Reply Br. of Pl. at 17–18, Dec. 26, 2020, ECF No. 29 ("Pl.'s Reply Br."); <u>see also</u> Pl.'s Rule 56.2 Mot. for J. on the Agency R. at 31–32, Aug. 21, 2020, ECF No. 23 ("Pl.'s Br.").

2. In determining whether there is political pricing of Russia's natural gas exports to the EU, should the focus be on the destination region or Russia's exports as a whole?

   a. How do you respond to Habaş's argument that the pricing of Russian exports to near-abroad countries has no bearing on the pricing of Russian exports to the EU? Pl.'s Br. at 30.

3. Why did Commerce conclude it was preferable to rely on benchmark data employing an energy/volume unit rather than to convert Habaş's natural gas purchase data into kilograms, where the conversion rates are provided by the supplier's and pipeline carrier's invoices and the conversion methodology is therefore known?

4. Is it your position that the collection and conversion issues that make the Comtrade and Eurostat data unsuitable for determining a tier-two benchmark similarly make these data unsuitable for determining a tier-three benchmark?

5. How do you respond to Habaş's argument that the use of data in annual figures may not accurately account for the volatility of natural gas prices? Pl.'s Br. at 38.

   a. Assuming that monthly data better reflect this volatility, what record evidence or case law supports Commerce's decision to rely on the IEA data despite its general preference for monthly reporting?

6. How do you respond to Habaş's argument that Commerce could not have used the IEA data to determine a tier-three benchmark under 19 C.F.R. § 351.511(a)(2) because the data are inclusive of re-gasified liquid natural gas, and so are insufficiently similar to Habas's purchases of gaseous natural gas from Botas?  Pl.'s Br. at 35–36; Pl.'s Reply Br. at 21.

   a. Did Commerce's adjustment of the IEA data to reflect the Russian market share adequately address Habaş's "similar product" concerns?  Please provide any case law that supports your conclusion.  Def.'s Br. at 15–16.

7. What cases and authorities best support your argument?

8. Are there any recent or pending Federal Circuit or CIT cases that may change the analysis?

Sincerely,

*/s/ Gary S. Katzmann*
Gary S. Katzmann, Judge