**UNITED STATES COURT OF INTERNATIONAL TRADE**

<span style="color:red">**NON-CONFIDENTIAL VERSION**</span>

<u>Proprietary information redacted at Attachment 1</u>

| | |
|---|---|
| HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Gary S. Katzmann, Judge |
| Defendant, | Court No. 20-00065 |
| and | |
| REBAR TRADE ACTION COALITION, | |
| Defendant-intervenor. | |

**RESPONSE OF PLAINTIFF**

**HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş.,**

**TO COURT'S LETTER OF APRIL 15, 2021**

_____

David L. Simon
LAW OFFICE OF DAVID L. SIMON
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC  20036
tel.:    (202) 481-9000
fax:    (202) 481-9010
e-mail:  dlsimon@dlsimon.com

April 27, 2021

## AUTHORITIES

### Cases

*China National Arts and Crafts Import and Export Corp., Tianjin Branch v. United States,* 771 F. Supp. 407 (Ct. Int'l Trade 1991) ...................................................... 15

*Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 896 F. Supp. 2d 1313 (Ct. Int'l Trade 2013) ................................................................ 7

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ........................................... 15

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 44 CIT , 459 F. Supp. 3d 1341 (2020) ............................................................................... 1, 9

*Hyundai Steel Co. v. United States,*  319 F. Supp. 3d 1327 (Ct. Int'l Trade 2012) ..................... 15

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ........................................ 15

*Rebar Trade Action Coalition v. United States*, 43 CIT , 398 F. Supp. 3d 1374 (2019) ............................................................................................................................ 2

*Vicentin S.A.I.C. v. United States*,  2020 Ct. Intl. Trade LEXIS 99 ; Slip Op. 2020-91 (July 20, 2020) ............................................................................................... 8

### Regulations

19 C.F.R. §351.301 .................................................................................................................. 4

19 C.F.R. §351.511 .................................................................................................................. 9

### Administrative Determinations

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 54,963 (Dep't Commerce Sept. 15, 2014) ................................................................................. 12

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 23,188 (Dep't Commerce, May 22, 2017), *affirmed*, *Rebar Trade Action Coal. v. United States,* 389 F. Supp. 3d 1371 (Ct. Int'l Trade 2019) ................................................. 5, 6, 15

### Other

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998). ..................... 8, 9

This is the response of Plaintiff Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. ("Habaş") to the Court's letter of April 15, 2021, Docket No. 35.

1.    The court previously upheld a determination by Commerce that Russian natural gas exports distorted EU pricing data where Russian natural gas comprised 39.5% of EU natural gas imports. *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 44 CIT , 459 F. Supp. 3d 1341 (2020) {"(Habaş v. US")}. Is the difference between 39.5% and 32.8% sufficient to require a finding that Russian exports are no longer distortive?

*Answer.*        The outcome of the present case is not driven by the share of Russian natural gas (NG) exports in the EU NG market, nor was *Habas v. US*.  In *Habas v. US*, 459 F. Supp. 3d at 1353, the Court cites the 39.5% Russian share of the EU NG market *only* in connection with Commerce's calculation to eliminate the effect of Russian NG on EU prices in the IEA report.  There, Commerce had decided that (i) Russian export prices were political *and* that (ii) the trade statistics were "likely" to be contaminated by compressed natural gas (CNG). *Id*. at 1345.  Commerce did not cite Russian market share as a reason that Russian export prices were not usable; rather, Commerce relied on the opinions in publications that the agency had placed on the record in the remand proceeding.  *Id.* at 1347.

In the present case, Habaş does not rely on Russia's 33% share of the EU market except to say that "it is difficult to see how Russia could engage in political pricing to the EU when its share of EU NG imports was less than one-third of the market in 2017."  Habaş principal brief at 31.  Rather, Habaş argues that there is no evidence in the trade statistics that Russian pricing is political, since the unit values and trends from all pipeline suppliers were virtually identical. *See*, *id*., *passim*, and particularly at 24-27 and 31-32.

In short, the decline in Russian's market share 39.5% to 33% supports the notion that Russia does not have the market power to drive prices, but it is not outcome-determinative.

a.    How does the evidence underlying Commerce's analysis of the distortive nature of  Russian natural gas prices in this case differ from that at issue in, for example,

Case 1:20-cv-00065-GSK   Document 37   Filed 04/27/21   Page 4 of 31
Non-Proprietary (Public) Version
Proprietary information redacted in brackets, [ ... ]

*Rebar Trade Action Coalition v. United States,* 43 CIT , 398 F. Supp. 3d 1374 (2019) {("*RTAC v. US*")}, where the court found that substantial evidence supported Commerce's determination that Russian natural gas prices were distorted?

*Answer.*     The issues in *RTAC v. US* do not track the issues in the present case.  In the review underlying *RTAC v. US*, Commerce made two decisions that were appealed:

- That Turkey had inbound pipeline connections with Russia, Azerbaijan, and Iran, while the pipeline with Romania was outbound only, 398 F. Supp. 3d at 1380-81.

- That domestic prices in Azerbaijan were an appropriate tier-2 benchmark, since it was appropriate for Commerce to "prioritize" prices from source countries with a pipeline connection to Turkey.  *Id*. at 1383.

- Secondarily, that "GTIS" (a trade data aggregator) statistics for NG trade were contaminated by the possible presence of CNG. *Id*. at 1382.

None of these issues is present in the instant case.  Specifically:

- In its preliminary decision memo (PDM) herein, at 10, PR 106, Commerce states that Turkey has three incoming NG pipelines, namely, from Russia, Azerbaijan, and Iran; this finding was not disputed by any party.

- No party provided information concerning Azerbaijani domestic prices or claimed that such prices were an appropriate benchmark.

- Here, no party contended that EU trade statistics from Russia were contaminated with CNG.  IDM at 13 ("There is no evidence on the instant record that any EU country imports Russian natural gas in cannisters (*i.e.,* in compressed form)").

In short, in *RTAC v. US*, the issue of distortion in Russian NG prices into the EU did not even arise, as the benchmark choice was between Azerbaijan domestic prices, as a tier-2 benchmark, and RTAC's IEA figures, as a tier-3 benchmark.  Here, Commerce relies entirely on

the opinions of commentators to support its finding that Russian NG pricing is political.

2. Assuming Commerce is not obligated to select a benchmark employing the same units of measurement as Habaş's purchases from Botas, is it also precluded from determining that a proposed dataset is unreliable based on the units of measurement in combination with other factors?

*Answer.*      Nothing in the CVD statute or regulations suggests that units of measurement are to be taken into account in benchmark selection.  First, Commerce selects the benchmark; then it makes any conversions required to reach a common unit.  The two exercises are separate.  The only sense in which units may affect reliability is when the record shows multiple, mutually inconsistent units, discussed below.

The defendants' arguments about units of measure lack factual or legal support; *see generally*, Habaş reply brief at 14-16. Commerce claims that the "natural gas benchmark … *needs to be* in the unit of measure in which Habas purchases natural gas, *i.e.*, cubic meters," IDM at 24 (emphasis added), but cites no precedent.  RTAC claims, "a kilogram of gas from one supplier may have a far different energy content … than a kilogram of gas from another supplier," RTAC brief at 11, but the record controverts RTAC's claim. *See*, Habaş reply brief at 13-14. The Botaş-Habaş supply contract specifies the chemical composition of the Botaş-supplied NG. *See*, Habaş questionnaire response (QR), BPI Appx Tab 1 Exh. 8.  Imported NG accounts for 99.35% of Turkish NG consumption.  PDM at 10. All of the imported NG in Turkey is imported *via* pipelines owned by Botaş − *i.e.*, the Turkish portion of the pipelines from Russia, Azerbaijan, and Iran.  *Id*.  There is no evidence that Botaş alters the chemical composition of the imported NG on its way to Habaş's intake.  Moreover, there is no reason to believe that the NG Russia sells to Turkey differs physically from the NG that Russia supplies to the EU.  Thus, RTAC's speculation about the variability of energy content − even if true − does not apply to Russian NG sold to the EU and to Turkey, since both come from the same supplier.  Therefore, it

*Non-Proprietary (Public) Version*
*Proprietary information redacted in brackets, [ ... ]*

is entirely legitimate to apply Habaş's conversions (kg to kWh) to EU imports of Russian NG for

benchmarking. Given the nature of the process in Commerce's rules for submitting factual

information and rebuttal factual information, 19 C.F.R. §351.301, it would have been incumbent

on RTAC to provide any evidence of differences in energy-densities of NG within or among

suppliers, and it did not do so.

> 3. Please identify the record evidence supporting your contention that the Comtrade and
>    Eurostat data were not converted into kilograms from any other units when the data
>    were originally collected and reported.

*Answer.*        The Eurostat data are official statistics of a reliable governmental entity,

and RTAC provided Eurostat's own description of its relevant statistic, RTAC benchmark

submission Exh. 6, Pub. Appx. Tab 2 ("Quantities correspond to the net mass…").  Once Habaş

provided ostensibly reliable Eurostat data in its benchmark submission, it was incumbent on

RTAC to rebut factually the reliability of those statistics.  Having failed to do so, RTAC falls

back on supposition and argument in lieu of fact, which fails the substantial evidence standard.

Comtrade is a UN organ which, *inter alia*, is an aggregator of trade statistics provided by

Member States and customs unions.  RTAC has placed no evidence on the record that Comtrade

does anything other than report the EU data in the manner in which they are provided by the EU.

Habaş has shown that the Comtrade average unit values (AUVs) for NG from Russia and each of

the other pipeline suppliers to the EU are identical to the Eurostat AUVs.  *See*, Habaş principal

brief at 24-6.  The government's response to this critical argument is flippant: "Commerce need

not address every piece of evidence presented by the parties."  Govt response brief at 13.  The

government does not dispute that the Eurostat and Comtrade data are in near-perfect agreement

and that there is no evidence that the quantity data are in any units other than mass (kg).

In the past, Commerce's objection to trade statistics has been that they were not reported

uniformly; that is, some individual countries reported in dual units of mass and energy content,

*Non-Proprietary (Public) Version*
*Proprietary information redacted in brackets, [ ... ]*

mass and volume, volume and energy content, etc., and the conversions among these units revealed differences in conversion factors.  *See*, Habaş reply brief at 3-4.  Here, the data are reported uniformly. All the trade statistics were reported in kilograms.  If there were other reporting units, as there were, *e.g.*, in *Steel Concrete Reinforcing Bar From Turkey: Final Affirmative CVD Determination*, 82 Fed. Reg. 23,188 (Dep't Commerce, May 22, 2017), IDM at 22 (*Rebar II*) (copy at Att. 2 to Habaş's reply brief), *aff'd*, *Rebar Trade Action Coal. v. United States,* 389 F. Supp. 3d 1371, 1382 (Ct. Int'l Trade 2019), then RTAC could have submitted them in its benchmark rebuttal.  It is certainly not unusual for governments to maintain trade statistics in a primary unit (kg, *e.g.*) as well as a secondary unit (cubic meters, *e.g.*), but the record contains no evidence of such dual-typology data collection here, and RTAC had the opportunity to provide it.  The lack of any such rebuttal compels the conclusion that the Eurostat figures − and consequently Comtrade as well − are collected and reported in one and only one unit of quantity, *viz.*, kilograms.  The gas chromatograph in Habaş's intake line, which gives real-time measurement of weight, is a standard measuring device. Habaş benchmark submission at 2. Neither RTAC nor Commerce suggests any reason that the EU pipelines would not have similar measuring devices within their pipelines, particularly at border points.  This would enable customs to take real-time kg measurements as the NG goes through the border crossing.

In sum, Habaş did not have the burden to prove that the government statistics in its benchmark were not a conversion of some other figures.  If such a putative conversion occurred, it was up to RTAC to expose it in its rebuttal.

a. Is it your position that Commerce must affirmatively demonstrate that the data were initially recorded in a unit other than kilograms in order to reject the data?

*Answer.*        As far as benchmarks are concerned, each side presents its proposed benchmarks, and the other side then has an opportunity to present rebuttal.  Habaş presented

*Non-Proprietary (Public) Version*
*Proprietary information redacted in brackets, [ … ]*

official statistics, and so the burden was on the petitioner to rebut those data. RTAC tried to do so by showing putative inconsistencies between the Eurostat and Comtrade datasets, but the inconsistencies vanished when the data were considered on an EU-28 basis. (See Habaş's response to question 4, below.)  Notably, RTAC did not supply any information showing that either EU Member States or the EU, itself, collected NG trade statistics on a dual-typology basis, even though such information would have been readily available.

Commerce's determination that data are unreliable because of differences in units of measurement must be supported by substantial evidence; there must be an inconsistency, on the record, between one set of units and another.  Where Commerce has rejected trade statistics on "units" grounds, it was because of evidence that the conversion from one type of unit to another was not consistent from country to country.  *See*, *Rebar II, supra*. This is not the case here.

4.  Is it your position that Eurostat's explanation of its collection methodology is also a sufficient explanation for the collection methodology employed in the Comtrade data?

*Answer.*       Eurostat explains that its quantity data are in mass units, *supra*.  Habaş used those data for its benchmark.  At that point, RTAC had an opportunity to rebut Habaş's benchmark data, whether by impugning its reliability or any other means.  RTAC chose not to impugn the units in which the data were reported, but only to assert that there were discrepancies between the Eurostat and Comtrade data.  RTAC's failure to identify any dual-unit typology anywhere constitutes a failure of proof on RTAC's part.  In the absence of such evidence, the Eurostat kg figures are of unrebutted and uncontested reliability.[1]

As for RTAC's claim of discrepancies between the Eurostat and Comtrade data, Habaş established that the EU-28 figures in the Eurostat and Comtrade datasets were virtually identical,

---

[1] This means that, if Russian pricing is, *arguendo*, political, the EU imports from the other pipeline suppliers remain a viable tier-3 benchmark candidate.

with a near-perfect correlation coefficient of 0.998.  Habaş principal brief at 24-25.  RTAC's

response is that, "While Habas characterizes these differences as 'negligible,' the existence of

any difference is problematic …." RTAC response brief at 9.  RTAC wants the Court to believe

that a negligible difference invalidates both data sources entirely. While the Court does not

reweigh the evidence, it must consider whether a variance between datasets of less than 0.5% −

smaller than the 1% statutory *de minimis* threshold, 19 U.S.C. §1671b(b)(4) − is "more than a

mere scintilla," *Nucor Corp. v. United States*, 675 F. Supp. 2d 1340, 1345 (Ct. Intl Trade 2010).

Regardless of whether Eurostat's description of its units is sufficiently detailed, the

burden was on RTAC to provide any information impugning the trade statistics, which it failed

to do. Furthermore, the entire Eurostat report, itself, which relies entirely on Eurostat trade

statistics, deals exclusively in mass units.  Commerce's own calculations rely on quantities in the

Eurostat report, *see infra*, raising the question of why the Eurostat data are reliable for one

purpose but not for another.  "An 'agency action is arbitrary when the agency offers{s}

insufficient reasons for treating similar situations differently.'" *Foshan Shunde Yongjian*

*Housewares Co. v. United States*, 896 F. Supp. 2d 1313, 1325 (Ct. Int'l Trade 2013).

    a.  How do you respond to RTAC's argument that the cited Eurostat report does not
explain Eurostat's collection methodology because it is instead a "report on the
general nature of recent energy trade" and only presents data on a "'net mass'
basis"? See Def.-Inter.'s Resp. Br. at 9–10, Nov. 10, 2020, ECF No. 27.

*Answer.*      The Eurostat report contains a narrative followed by technical definitions,

including "data sources" and "units of measure."  The narrative of the Eurostat report, replete

with tables and graphs, relies exclusively on Eurostat quantities (mass units) and value (euros);

there is no mention of any other unit.  While the Eurostat report does not detail the measuring

devices in the EU pipeline system, the fact that its sole quantitative reference is to mass units

confirms that the official statistics are collected only in mass units and not in dual units. In any

event, RTAC had an opportunity to rebut the reliability of the Eurostat figures proffered by

Habaş and it did not do so.

5.  Which statutory or regulatory authority requires Commerce to consider product
    similarity when selecting the data to use for a tier-three benchmark determination?

The regulation does not explicitly require comparability when, under tier 3, Commerce

assesses "whether the government price is consistent with market principles."  However,

Commerce's tier-3 analysis in the present case is unlike the tier-3 analysis envisioned in the

regulations.  In its explanation of the present CVD rules, Commerce explained:

> Paragraph (a)(2)(iii) provides that, in situations where the
> government is clearly the only source available to consumers in the
> country, we normally will assess whether the government price
> was established in accordance with market principles … through
> an analysis of such factors as the government's price-setting
> philosophy, costs (including rates of return sufficient to ensure
> future operations), or possible price discrimination.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998) (*1998*

*Notice*).  The tier-3 benchmarking in the present case looks nothing like the model in the 1998

notice; Commerce took no evidence of Botaş's price-setting philosophy, its costs and rates of

return, or the like.  Here, Commerce's tier-3 approach here is essentially a tier-2 approach, minus

the requirement that the benchmark article be available in Turkey.  Where Commerce so deviates

from the regulatory model, and uses such a modified tier-2 approach, it should be required to

apply the tier-2 comparability requirement as well. *Vicentin S.A.I.C. v. United States*,  2020 Ct.

Intl. Trade LEXIS 99 ; Slip Op. 2020-91 at 15 (July 20, 2020) ("{W}hen Commerce chooses to

deviate from an established practice or methodology, the agency must clearly explain itself so

that the court may assess the reasonableness of its decision").

In any event, this is really a matter of nomenclature rather than substance.  The real

defect is that the IEA pricing captures whatever is in the pipeline.  The pipelines contain both

gaseous NG and regasified LNG and quite possibly some amount of CNG.   Commerce has historically rejected, as a threshold matter, any proposed benchmark that may contain any *admixture* of natural gas other than NG in its gaseous state.   *See*, *Habas v. US*, *supra*, 459 F. Supp. 3d at 1345.   No such issue arises for the trade statistics, since by their HTS code they exclude LNG and Commerce acknowledges they contain no CNG. IDM at 13.

    a.   Under 19 C.F.R. §351.511, is it your position that the requirement for product similarity to be considered in tier-one and tier-two benchmark determinations, extends to a tier-three determination? See 19 C.F.R. § 351.511(a)(2)(i)–(iii).

If Commerce had analyzed whether Botaş's rate of return was consistent with market principles, whether its pricing captured its costs, etc., as envisioned in the *1998 Notice*, then no comparability analysis would have been needed. However, since Commerce's tier-3 approach is merely a tier-2 approach minus the availability requirement, then Commerce must consider whether the benchmark article is comparable to the article in question.   In short, when Commerce "borrows" the tier-2 methodology for tier 3, it must borrow the tier-2 methodology in full, including product comparability (aside from availability).

Finally, we reemphasize that the defect of the IEA report is the contamination of the IEA figures by the admixture of LNG and, likely, CNG.   These are different products from gaseous NG, and the presence of *either* of them in the data renders the data unusable *ab initio* for benchmarking. *See*, *Habas v. US*, *supra*, 459 F. Supp. 3d at 1345.

6.   The Government explains that Commerce adjusted the record data to account for (and remove) the presence of liquified natural gas imports. Def.'s Resp. to Pl.'s Mot. for J. on the Agency R., Nov. 10, 2020, ECF No. 26 ("Def.'s Br."). Why is the adjustment of the IEA data not sufficient to avoid distortion?

Commerce's adjustment is built on flawed premises that are arithmetically unsuitable in an environment that demands precision to two decimal places. To show this, we provide, in Attachment 1 hereto, printouts of the spreadsheets in Commerce's final calculations, CR 105, PR

145. These were not included in the appendices previously filed herein.

On page 1 ( "Russia NG%"), Commerce estimates the LNG adjustment.  At rows 3-8, Commerce estimates that 84.09% of all EU imports of natural gas (gaseous natural gas, GNG, plus LNG) consist of GNG.  Commerce cites to Fig. 2 of the Eurostat report, *viz*.:



Figure 2: Share of each product in extra-EU imports in energy, 2017 and 2018(share (%) of trade in value)

Figure 2 shows the share of total EU energy imports, by value, in 2017 (red) attributable to different energy products.  We added arrows to point to LNG and GNG. Commerce reads this chart as showing that 3.5% of all energy imports in 2017 were LNG, and 18.5% were GNG. Commerce then derives that 84.09% of all EU gas imports were GNG. Commerce's conclusion, to hundredths of a percent, belies the eyeball estimation of its sources. Were GNG imports really 18.5% of total energy imports in 2017?  Not 19%?  Or 18.4?  The chart does not allow such precision. For LNG imports, the problem is worse because the bar on the chart is so small.

The result of a calculation can be no more precise than its least precise input.[2]  Here, the

---

[2] If we know that the population of "Gazistan" is exactly 437,089 people and that about 40% are under the age of 30, we cannot say that *exactly* 174,835.6 people are under 30; we can only say that *about* 175,000 people are under 30.

purported two-decimal-point precision of Commerce's figure is statistically unsupported.

Commerce repeats this type of exercise at rows 13-17, where it shows the value of EU total gas

imports.  This time, the source is Fig. 5 of the Eurostat report:



Figure 5: Extra-EU-28 imports of natural gas, 2014-2018(EUR billion and million tonnes)

Commerce claims that the split in the relevant bar element is precisely 24:36.  Are we

sure it is not 23:37?  22:28?  Again, Commerce pretends to a much higher degree of precision

than warranted by the source.

From these eyeball estimates, Commerce calculates that total EU imports of LNG in 2017

were 9.55 billion euros (cell C29).  The accuracy and precision of the figure are dubious at best.

Note that Figs. 2 and 5 are from the Eurostat report; their source is Eurostat trade

statistics − the very statistics that Commerce *rejects* as the source for a benchmark.  If these data

are good for one purpose, why are they not good for all?

Moreover, even the government admits that the adjustment for EU imports of LNG only

enters into the calculation of Russia's share of the EU NG market.  Gov't response brief at 16.

Thus, Commerce has not adjusted for the impact of imported LNG on the *unit value* of the

natural gas in the IEA reports. Because Commerce has no data on the AUV of LNG imports, it actually has no way to make this crucial adjustment.  This is why the contamination of the gas stream with LNG is a *threshold* issue: if Commerce cannot eliminate the impact of the AUV of the LNG on end-user prices, it cannot rely on the IEA as a benchmark.[3]

Another element of the benchmark calculation is the unit value of Russian NG exports to the EU, which Commerce calculates on its sheet "Russia AUV," Att. 2 at 1. This calculation relies on figures in Gazprom's 2018 annual report, PR 86. We provide this in Attachment 2 hereto, and comment as follows.

The volume figure, 242.0 billion cubic meters, is Gazprom's reported exports to its "Far Abroad" markets, from page 117 of the Gazprom report.  Gazprom states that "Far Abroad" includes Europe and Turkey. *Id*.  The mere fact that Commerce's calculation relies on data that includes exports to Turkey invalidates the entire exercise; the exclusion of sales to the respondent country is a mandatory step of Commerce's calculations. *Steel Concrete Reinforcing Bar From Turkey: Final Affirmative CVD Determination*, 79 Fed. Reg. 54,963 (Dep't Commerce Sept. 15, 2014), IDM at 10 (Att. 1 to Habaş's reply brief) ("because the market for natural gas in Turkey is distorted, we have removed the value for Turkey … from our calculations").

Moreover, the Gazprom report does not state whether its volume figures are in standard cubic meters (SCM, *i.e.*, adjusted to standard temperature and pressure) or unadjusted cubic meters (CM).  In Att.1 at 2, Commerce converts Gazprom's billions of CM into kilowatt-hours, in cell E6, using the SCM:kWh ratio of Habaş's purchases of NG from Botaş.[4]  We provide the

---

[3] Even if Commerce could eliminate the impact of LNG imports on prices, the post-importation cost of regasification embedded in the end-user prices would still disqualify the IEA figures.

[4] Commerce thus implicitly accepts that the physical composition (and therefore energy content) of the Russian NG piped into Turkey is the same as that which Russia sends into the EU.

latter worksheet (with certain irrelevant columns omitted for legibility) at BPI Att. 1, page 3. The figure in cell L60 is Habaş's SCM:kWh conversion.  In cell J62, we have added a similar calculation showing the ratio of unadjusted CM to kWh.  The difference between the two conversion ratios is 4.3% − a significant difference given that the entire subsidy for this program is only 3.3%.   IDM at 4.  Commerce does not explain why it assumed that the Gazprom figures were in SCM; this is speculative at best.

Note that, since the Gazprom volume is in billions of CM, the kWh energy total cannot be more precise than billions of kWh.

At page 4 of BPI Att. 2, Habaş reproduces Commerce's "Russia AUV" worksheet, *supra*, but adds a calculation showing the difference that would arise if Commerce considered the Gazprom figures as actual CM rather than SCM.  The difference is, in round terms, 4.5% − substantially bigger than the benefit ratio for this program.

Thus, Commerce's *assumption*, which is not supported by even a scintilla of evidence, that the Gazprom annual report is in SCM, actually creates the appearance of a subsidy where none would otherwise exist.  This is decision-making by speculation. Furthermore, Commerce's reliance on a Gazprom document for the unit value of Russian exports is inconsistent with Commerce's essential argument that the Russian NG sector is pervasively distorted by politics. Isn't the Gazprom annual report therefore an unreliable "political" document?

Commerce calculates the NG benchmark in the worksheet, "NG Benchmark," BPI Att. 1 at 5. The adjustment to "eliminate" the impact of EU NG imports from Russia is at rows 41-42. We have previously explained the defects in the Russian share of EU imports at cell B42.

Another significant defect of Commerce's calculation at rows 41-42 is the agency's reliance on import shares in *2014* to estimate adjustments for 2017. Commerce does not give a

pinpoint cite for this figure, and counsel has been unable to find the 2014 EU NG domestic

supply figure of 33.00% in the Eurostat report. In any event, using a *2014* figure to adjust market

shares in *2017* (cells F42-G42) eliminates any semblance of substantiality that the calculations

may otherwise have, particularly given the variability of EU NG imports and the inverse

relationship between quantity and value over time shown in Fig. 5 of the Eurostat report, *supra*.

    7.   Is it your position that Commerce's adjustments to the IEA data only made the data less accurate and thus less reliable for a tier-three benchmark determination?

Yes.  In addition to the above analysis, it bears emphasizing that Commerce's average

unit value (AUV) is calculated by a simple average of prices to both industrial users and

electricity generators; *see*, BPI Att. 1 at 5, which includes the following public calculation:

| User Category | Average Unit Value | | |
|---|---|---|---|
| | USD/MWh | USD/KWh | TL/KWh |
| Industrial | 27.24 | 0.027239 | 0.098123 |
| Electricity Generation | 24.75 | 0.024755 | 0.089173 |
| Average | 26.00 | 0.025997 | 0.093648 |

The difference between the price to industrial users, 0.098123, and the average price used in the

benchmark, 0.093648, is 5.02% − substantially bigger than the CVD benefit rate.

Habaş is an electricity producer and therefore receives the lowest rate from Botaş.  While

it has separate meters for power generation, steel making, coil production, and kitchen, the unit

prices for all except the kitchen are the same.  *See*, Habaş QR, Exh. 6, BPI Appx. Tab 1.  Energy

consumption in the kitchen is negligible.  *Id*.  Thus, Commerce compares an average IEA price

to power generators and industrial users, taken together, to the Botaş price to Habaş, which is

strictly a power-generator price.  The 5.02% difference between the IEA AUVs to power

generators *versus* the IEA average is the source of the net subsidy rate of 3.02% for the NG

LTAR "program."

Commerce's price-averaging is a further example of Commerce's manipulation of the

data in a way that disadvantages Habaş.

8.   What cases and authorities best support your argument?

Principal cases include *Nucor v. United States*, 675 F. Supp. 2d 1340, *supra* (substantial

evidence is "more than a mere scintilla"); *Nippon Steel Corp. v. United States*, 458 F.3d 1345,

1350-51 (Fed. Cir. 2006) (court must assess whether the agency action is reasonable given the

record as a whole);  *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)

(substantial evidence standard requires more than mere assertion of "evidence which in and of

itself justified {the determination}, without taking into account contradictory evidence…");

*Hyundai Steel Co. v. United States*,  319 F. Supp. 3d 1327, 1342 n. 13 (Ct. Int'l Trade 2012)

("Commerce must base its decisions on the record before it in each individual investigation");

*China National Arts and Crafts Import and Export Corp., Tianjin Branch v. United States,* 771

F. Supp. 407 (Ct. Int'l Trade 1991) (Commerce may not rely on speculation).

Other cases relating to particular factual issues are cited above, *e.g.*, that Commerce will

not reject a proffered benchmark because of issues relating to units of measurement unless the

record actually shows conflicting conversions among units, *Rebar II, supra*.

9.   Are there any recent or pending Federal Circuit or CIT cases that may change the
analysis?

Habaş is not aware of any such cases.

Respectfully submitted,

David L. Simon
Law Office of David L. Simon
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC  20036
tel.:    (202) 481-9000
e-mail:  dlsimon@dlsimon.com

April 27, 2021                                                    Counsel to Habaş

## **ATTACHMENTS**

| Att. No. | Document | Pages Cited | CR/PR No. |
|---|---|---|---|
| 1 | Dep't Commerce  final calculation spreadsheet prints (March 16, 2020 | All | CR 105 PR 145 |
| 2 | Dep't Commerce memo, "Steel Concrete Reinforcing Bar from the Republic of Turkey: Benchmark Data for the Provision of Natural Gas for Less Than Adequate Remuneration (LTAR) and the Provision of Liquified Natural Gas (LNG) for LTAR" (Aug. 15, 2019) {Gazprom annual report} | 1-8 | |

## ATTACHMENT 1 (PUBLIC)

| Document | Pages Cited | CR/PR No. |
|---|---|---|
| Dep't Commerce  final calculation spreadsheet prints (March 16, 2020 | All | PR 145 |

| | B | C | D | E | F |
|---|---|---|---|---|---|
| 1 | PUBLIC | | | | |
| 2 | | Percentage | | | |
| 3 | Liquified Natural Gas (LNG)  Share of All Energy Imports into European Union | 3.5 | A | | |
| 4 | Gaseous Natural Gas (GNG) Share of All Energy Imports into European Union | 18.5 | B | | |
| 5 | | | | | |
| 6 | LNG as a percentage of All EU Gas Imports | 15.91% | C= A/ (A+B) | | |
| 7 | | | | | |
| 8 | GNG as a percentage of All EU Gas Imports | 84.09% | D = B/ (A+B) | | |
| 9 | | | | | |
| 10 | Source: Petitioner August 7, 2019 Benchmark Submission at Exhibit 6, Page 4, Figure 2 | | | | |
| 11 | | | | | |
| 12 | | Billions of Euros | | | |
| 13 | Total Gas Imports into European Union | 60 | E | | |
| 14 | | | | | |
| 15 | Russian Gas Imports into European Union | 24 | F | | |
| 16 | | | | | |
| 17 | Other Countries Gas Imports into European Union | 36 | G | | |
| 18 | | | | | |
| 19 | Source: Petitioner August 7, 2019 Benchmark Submission at Exhibit 6, Page 5, Figure 5 | | | | |
| 20 | | | | | |
| 21 | | Billions of Euros | | | Percentage of Total GNG Imports into European Union |
| 22 | Total GNG Imports into  European Union | 50.45 | H= E * D | | 100.00% |
| 23 | | | | | |
| 24 | Russian GNG Imports into European Union | 24.00 | I = F | | 47.57% |
| 25 | | | | | |
| 26 | Other Countries GNG Imports into European Union | 26.45 | J = H-I | | 52.43% |
| 27 | | | | | |
| 28 | | | | | |
| 29 | Total EU LNG | 9.55 | K = E * C | | |
| 30 | | | | | |
| 31 | Total EU Gas Imports Recheck | 60.00 | L = H + K | | |

|  | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | PUBLIC | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | NATURAL GAS FOR LTAR BENCHMARK | | | | | | | |
| 4 | | Gazprom 2018 Annual Report: 2017 Natural Gas Exports | | | | | | | |
| 5 | | Country | Volume (bcm) | Volume (SM3) | Volume (KWh) | Value, net of excise tax and customs duties (RUB) | Value (USD) | Value (TL) | AUV (TL/KWh) |
| 6 | | Russia | 242.0 | 242,000,000,000.00 | 2,574,880,001,465.01 | 2,221,200,000,000.00 | $37,976,057,205.34 | 136,800,594,848.03 | 0.0531289 |
| 7 | | Source:  Commerce Benchmark Submission at Exhibit 1 | | | | | | | |

calcs BPI/Russia AUV

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | CONTAINS BUSINESS PROPRIETARY INFORMATION | | | | | | | |
| 2 | PUBLIC VERSION | | | | | | | | |
| 3 | | NATURAL GAS FOR LTAR BENCHMARK | | | | | | | |
| 4 | | | | | | | | | |

| Country | Local Currency | Ex Tax Values for Industrial Users | | Ex Tax Values for Electricity Generation | |
|---|---|---|---|---|---|
| | | Local/MWh | USD/MWh | Local/MWh | USD/MWh |
| Austria | EUR | 25.09 | 28.22 | 21.46 | 24.13 |
| Belgium | EUR | 23.25 | 26.15 | x | x |
| Czech Republic | CZK | 660.80 | 28.18 | x | x |
| Denmark | DKK | 173.00 | 26.16 | x | x |
| Estonia | EUR | 23.41 | 26.33 | x | x |
| Finland | EUR | 20.04 | 22.54 | 24.17 | 27.18 |
| France | EUR | 30.07 | 33.82 | x | x |
| Germany | EUR | 19.83 | 22.30 | x | x |
| Hungary | HUF | 6,870.00 | 24.96 | 6,823.00 | 24.79 |
| Ireland | EUR | 28.38 | 31.92 | x | x |
| Latvia | EUR | 25.41 | 28.58 | | |
| Luxembourg | EUR | 25.09 | 28.22 | x | x |
| Netherlands | EUR | 20.25 | 22.77 | x | x |
| Poland | PLN | 94.60 | 24.93 | 72.6 | 19.13 |
| Portugal | EUR | 26.70 | 30.03 | 23.05 | 25.92 |
| Slovak Republic | EUR | 27.50 | 30.93 | 28.95 | 32.56 |
| Slovenia | EUR | 24.31 | 27.34 | x | x |
| Spain | EUR | 23.28 | 26.18 | x | x |
| Sweden | SEK | 265.70 | 30.96 | x | x |
| United Kingdom | GBP | 18.92 | 24.30 | 15.24 | 19.57 |

**IEA EU Natural Gas Prices for 2017**

Sources: Petitioner's August 7, 2019 Natural Gas Benchmark submission at Exhibit 2, 2018 IEA Report

| User Category | Average Unit Value | | |
|---|---|---|---|
| | USD/MWh | USD/KWh | TL/KWh |
| Industrial | 27.24 | 0.027239 | 0.098123 |
| Electricity Generation | 24.75 | 0.024755 | 0.089173 |
| Average | 26.00 | 0.025997 | 0.093648 |
| | | | A |

| Reported Consumption (KWh) | Delivery Fees (TL) | Per Unit Delivery Fees (TL/KWh) | Special Consumption Tax (TL) | Per Unit Special Consumption Tax (TL/KWh) | Stamp Tax (TL) | Per Unit Stamp Tax (TL/KWh) | Per Unit VAT (18%) |
|---|---|---|---|---|---|---|---|
| | | B | | C | | D | E |

Source: Habas April 15, 2019 IQR at Exhibit 6

| Russian Share of Imports to the EU in 2017 | Non-Russian Share of Imports to the EU in 2017 | Share of Natural Gas Consumption Supplied by EU Countries in 2014 | Share of Natural Gas Consumption Supplied by Imports to the EU in 2014 | Estimated Share of Russian-Supplied NG in the EU Market in 2017 | Estimated Share of Non-Russian-Supplied NG in the EU Market in 2017 | Russian AUV in 2017 (TL/KWh) |
|---|---|---|---|---|---|---|
| 47.57% | 52.43% | 33.00% | 67.00% | 31.87% | 68.13% | #REF! |
| | | | | F | G | H |

Sources: Petitioner's August 7, 2019 Natural Gas Benchmark submission at Exhibit 6
Russian Share of Imports to the EU in 2017 from Russia NS % Worksheet

| EU AUV Adjusted for Russian Imports (TL/KWh) | EU Benchmark Price Delivered AUV (TL/KWh) | EU Benchmark Price AUV (TL/KWh) |
|---|---|---|
| 0.112602 | 0.120369 | 0.14203539 |
| I = (A - (H*F)) / G | J = I + B + C + D | K = J * (1 + E) |

# ATTACHMENT 2

| Document | Pages Cited | PR No. |
|---|---|---|
| Dep't Commerce memo, "Steel Concrete Reinforcing Bar from the Republic of Turkey: Benchmark Data for the Provision of Natural Gas for Less Than Adequate Remuneration (LTAR) and the Provision of Liquified Natural Gas (LNG) for LTAR" (Aug. 15, 2019) {Gazprom annual report} | 1-8 | 86 |

Case 1:20-cv-00065-GSK   Document 37   Filed 04/27/21   Page 24 of 31

Barcode:3879270-01 C-489-830 REV - Admin Review 3/1/17 - 12/...



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-489-830
Administrative Review
3/1/2017-12/31/2017
**Public Document**
E&C/Office VII:  KT

DATE:                August 15, 2019

MEMORANDUM TO:       The File

THROUGH:             Mark Hoadley
                     Program Manager
                     Office VII, AD/CVD Operations
                     Enforcement and Compliance

FROM:                Kathryn Turlo
                     International Trade Compliance Analyst
                     AD/CVD Operations, Office VII
                     Enforcement and Compliance

SUBJECT:             Steel Concrete Reinforcing Bar from the Republic of Turkey:
                     Benchmark Data for the Provision of Natural Gas for Less Than
                     Adequate Remuneration (LTAR) and the Provision of Liquified
                     Natural Gas (LNG) for LTAR

_____

The Department of Commerce (Commerce) is hereby submitting factual information to the
record in the above-mentioned review for the purpose of measuring the adequacy of
remuneration for natural gas and LNG, pursuant to 19 CFR 351.301(c)(4).  **Interested parties
have an opportunity to submit rebuttal factual information, pursuant to 19 CFR 351(c)(4),
no later than 5:00 p.m. ET on August 22, 2019.**

Attachment I:       Gazprom Annual Report 2018 (for the purpose of adjusting European
                    natural gas values to eliminate possible price distortion caused by Russian
                    exports, if necessary)
Attachment II:      U.S. Department of Energy (DOE) LNG 2017 Monthly Report (for the
                    purpose of determining adequate remuneration of LNG purchases, if
                    necessary, pursuant to 19 CFR 351.511(a)(2)(ii))
Attachment III:     DOE LNG Monthly Data File (for the purpose of determining adequate
                    remuneration of LNG purchases, if necessary, pursuant to 19 CFR
                    351.511(a)(2)(ii))
Attachment IV:      Oxford Institute LNG Shipping Forecast (for the purpose of determining
                    adequate remuneration of LNG purchases, if necessary, pursuant to 19
                    CFR 351.511(a)(2)(ii))
Attachment V:       Turkey Inland Freight Costs (for the purpose of determining "delivery
                    charges," if necessary, pursuant to 19 CFR 351.511(a)(2)(iv))
Attachment VI:      Distance to Ports ((for the purpose of determining "delivery charges," if
                    necessary, pursuant to 19 CFR 351.511(a)(2)(iv))

Barcode:3879270-01 C-489-830 REV - Admin Review 3/1/17 - 12/31/17

**Attachment I:  Gazprom Annual Report 2018**

Barcode:3879270-01 C-489-830 REV - Admin Review 3/1/17 - 12/31/17

PJSC Gazprom Annual Report
2018

GAZPROM



# A Strategic Resource

Filed By: Kathryn Turlo, Filed Date: 8/15/19 2:52 PM, Submission Status: Approved

Barcode: 3879270-01 A-570-053 ... Admin Review

This Annual Report has been prepared based on Resolution No. 1 of PJSC Gazprom's Management Committee On Organising Activities Related to Holding PJSC Gazprom's Annual General Shareholders Meeting dated 24 January 2019.

The terms "PJSC Gazprom" and the "Company" used in this Annual Report refer to the parent company of Gazprom Group, i.e. for Public Joint Stock Company Gazprom (Open Joint Stock Company Gazprom, JSC Gazprom, before 17 June 2015). The terms "Gazprom Group", the "Group" or "Gazprom" mean an aggregate of entities which includes PJSC Gazprom and its subsidiaries and entities. For the purposes of this Annual Report, the lists of Gazprom Group's subsidiaries and entities, associates and joint ventures, as well as entities in which Gazprom has investments classified as joint operations, were prepared based on the principles used in the preparation of PJSC Gazprom's IFRS consolidated financial statements.

Similarly, the terms "Gazprom Neft Group" and "Gazprom Neft" refer to PAO Gazprom Neft and its subsidiaries and entities; "Gazprom energoholding" refers to OOO Gazprom energo-holding and its subsidiaries; and "Gazprom neftekhim Salavat" refers to OOO Gazprom neftekhim Salavat and its subsidiaries.

This Annual Report determines some operating and economic parameters in accordance with the IFRS principles for Gazprom Group's enti-ties included in the IFRS consolidated financial statements of PJSC Gazprom for the year ended 31 December 2018. Therefore, they may differ from similar parameters in reports of PJSC Gazprom prepared under Russian statu-tory requirements.

Moreover, some operating parameters of PJSC Gazprom, its subsidiaries, entities, associates, and joint ventures are determined in accordance with the principles underlying management reporting. Parameters calculated using these methods might be not comparable between each other due to differences in the methodologies used for preparing consoli-dated financial statements and for manage-ment reporting.

Analysis of financial results should be read in conjunction with the audited consolidated financial statements of PJSC Gazprom for the year ended 31 December 2018 prepared in accordance with IFRS.

Among other things, the Annual Report discloses information on the future production and economic activities of Gazprom Group, based on Gazprom management's forecasts and estimates considering the current situation. Actual results may differ from the said fore-casts and estimates due to the effect of various objective factors.

# Marketing

Gazprom is the largest supplier of gas in Russia and a global leader in gas exports. The Company has a strong track record of delivering on its commitments to ensure reliable gas supply to consumers amid the growing demand. In 2018, Gazprom's gas exports to European far abroad countries were at a record high for the third year running.

**Far Abroad Gas Markets**

Far abroad countries, including Europe, are the Company's traditional export market offering high profit margins for the Group.

In 2018, Gazprom Group sold 243.3 bcm of natural gas to far abroad countries. Gas sales showed significant growth in the UK and the Netherlands. At the same time, sales to Turkey decreased due to the impact of weather conditions, increased LNG supplies to the market in Q4 2018, and a weaker national economy.

Net sales revenue (net of excise tax and customs duties) was RUB 2,951.2 bn. The increase in sales revenue was mainly driven by higher average selling price and increased sales volumes.



**Gazprom Group's sales of natural gas to far abroad countries**

Sales volumes, bcm

| | |
|---|---|
| 2016 | 228.3 |
| 2017 | 242.0 |
| 2018 | 243.3 |
| Change 2018/2017 | 0.5% |

Average selling price
(including excise tax and customs duties), USD per mcm*

| | |
|---|---|
| 2016 | 176.0 |
| 2017 | 200.2 |
| 2018 | 246.4 |
| Change 2018/2017 | 23.1% |

Average selling price
(including excise tax and customs duties), RUB per mcm

| | |
|---|---|
| 2016 | 11,763.3 |
| 2017 | 11,670.5 |
| 2018 | 15,499.5 |
| Change 2018/2017 | 32.8% |

Net sales revenue
(net of excise tax and customs duties), RUB bn

| | |
|---|---|
| 2016 | 2,140.0 |
| 2017 | 2,221.2 |
| 2018 | 2,951.2 |
| Change 2018/2017 | 32.9% |

* Calculated based on the year-average RUB/USD exchange rate.

Performance Results

Barcode:3879270-01 C-489-830 REV - Admin Review 3/1/17 - 12/31/17

**Gazprom Group's gas sales to far abroad countries, 2017–2018, bcm**



Ireland 0.1 0.3
Finland 2.4 2.6
United Kingdom 29.1 34.2
The Netherlands 17.4 21.4
Germany 67.1 65.7
Denmark 1.8 1.7
Belgium 2.7 2.8
France 13.3 13.3
Poland 10.5 9.9
Switzerland 0.4 0.6
Czech Republic 3.8 2.6
Austria 9.8 9.0
Slovakia 4.5 5.0
Spain 0.2 0.1
Slovenia 0.6 0.5
Hungary 7.0 7.3
Italy 23.7 22.6
Croatia 2.8 2.8
Bosnia and Herzegovina 0.2 0.2
Romania 1.4 1.5
Other countries 5.5 6.3
Serbia 2.2 2.2
Macedonia 0.3 0.2
Bulgaria 3.3 3.2
Greece 2.9 3.3
Turkey 29.0 24.0

▪ Natural gas sales in 2017
▪ Natural gas sales in 2018

**Note.** Gazprom Group's sales to other countries include LNG sales and sales of gas from international hydrocarbon exploration and production projects in which the Group has equity stakes.

### PJSC Gazprom's compliance with the EU competition laws

On 24 May 2018, the European Commission adopted a decision in accordance with Article 9 of Council Regulation (EC) No. 1/2003 on the alleged infringement by PJSC Gazprom of the EU competition laws, imposing binding commitments on Gazprom to enable free flow of gas at competitive prices in Central and Eastern European gas markets as offered by PJSC Gazprom and OOO Gazprom export on 15 March 2018.

The Company has taken steps to meet the above Commitments as soon as the notice on the decision has been given to PJSC Gazprom and OOO Gazprom export. The first phase of these efforts, completed on 6 August 2018, included sending letters specified in the Commitments to PJSC Gazprom's and OOO Gazprom export's counterparties covered by the Commitments.

PJSC Gazprom is a major supplier of natural gas to the European market.

In 2018, PJSC Gazprom's gas supplies to European far abroad countries under OOO Gazprom export's contracts and Gazprom Schweiz AG's direct contracts totalled 201.9 bcm, up 7.5 bcm, or 3.8% year-on-year.

# 201.9 bcm

**An all-time record for gas supplies to European far abroad countries**

Filed By: Kathryn Turlo, Filed Date: 8/15/19 2:52 PM, Submission Status: Approved

The Company's exports are diversified by market, the largest consumers being Germany, Turkey, and Italy.

**Growth drivers for PJSC Gazprom's gas supplies to European far abroad countries in 2018**

— A year-on-year increase in demand for natural gas in European countries in February and March 2018 due to cold weather
— Gas injections into UGSFs in European countries exceeding withdrawals
— Declining domestic gas production in European far abroad countries as compared to 2017, and higher net gas imports in Europe
— Limited capabilities of other gas exporters and lower net LNG imports in Q1–Q3 2018

> **Our goal for 2019 in the European far abroad markets is to sustain our achievements and maintain our position in the market, including our share in overall supplies.**

**Share of PJSC Gazprom's gas sales under OOO Gazprom export's contracts and Gazprom Schweiz AG's direct contracts in the total gas consumption in European far abroad countries, 2014–2018, %**



| | |
|---|---|
| 2014 | 30.4 |
| 2015 | 31.5 |
| 2016 | 33.1 |
| 2017 | 34.2 |
| 2018 | 36.8 |

**Note.** Figures for 2017 and previous years may differ from the data in Annual Reports of PJSC Gazprom for previous periods since international statistics may be subsequently updated.

**Proprietary electronic sales platform**

In August 2018, OOO Gazprom export launched its Electronic Sales Platform (ESP) to sell natural gas both on standard market terms and on its own terms. Contracts for gas supply at any delivery point (both at trading platforms or facilities with slow-moving inventories located close to the borders) with delivery periods starting from one day can be offered via the ESP. OOO Gazprom export holds daily trading sessions and offers contracts for the supply of natural gas to various delivery points to pre-qualified companies registered on the ESP.

As a result of trading sessions held in 2018, OOO Gazprom export sold about 1.1 bcm of gas with delivery in the reporting year.

In 2018, Gazprom Group's subsidiaries sold 28.2 bcm of gas directly to end consumers in Europe.

For more details on gas sales volumes to end consumers in far abroad countries see Gazprom in Figures 2014–2018 Factbook

**Large-scale LNG Sales**

Large-scale LNG sales from Gazprom Group's trading portfolio totalled 3.88 mm tonnes, or 5.18 bcm, in 2018, up by 16% year-on-year.

Corporates in Asia Pacific were the key buyers of large-scale LNG (76% of the total supply volume) from Gazprom Group's trading portfolio in the reporting year, just like in previous years. In 2018, India became the key destination for LNG supplies for the first time: this market accounted for 20% of total supplies (1.01 bcm). The growth in India's share in large-scale LNG supplies by Gazprom Group was mainly driven by the start of supplies under a long-term LNG sales and purchase agreement signed between Gazprom Marketing & Trading Singapore and Indian GAIL. The agreement provides for the annual supply of up to 2.9 mm tonnes of LNG over 20 years (at a plateau).

For more details on LNG market trends see the Trends and Developments on Gas Markets section

**Large-scale LNG sales by Gazprom Group in foreign countries**

| | 2016 | 2017 | 2018 |
|---|---|---|---|
| mm BTU | 176,474,067 | 159,151,850 | 184,990,184 |
| including LNG from Sakhalin-2 | 59,443,050 | 72,894,365 | 70,068,095 |
| mm tonnes | 3.71 | 3.34 | 3.88 |
| bcm | 4.94 | 4.46 | 5.18 |

**Notes:**
1. Calculated in accordance with the principles underlying management reporting. Parameters calculated using these methods might be not comparable between each other due to differences in the methodologies used for preparing consolidated financial statements and for management reporting.
2. Data excludes LNG supplies from Gazprom Group's trading portfolio to Russia (0.08 mm tonnes, or 0.11 bcm) as part of pre-commissioning operations at an LNG receiving terminal in the Kaliningrad Region.



# 76%

**Share of Asia Pacific markets in total LNG supplied from Gazprom Group's trading portfolio in 2018**

Performance Results

### LNG sales to foreign markets in 2018, mm BTU



| | | |
|---|---|---|
| ■ | India | 36,100,075 |
| ■ | Japan | 29,667,398 |
| ■ | China | 29,159,927 |
| ■ | South Korea | 26,402,240 |
| ■ | Kuwait | 20,072,378 |
| ■ | Taiwan (China) | 19,257,270 |
| ■ | Spain | 2,945,511 |
| ■ | FOB LNG supplies | 21,385,385 |
| | Total | 184,990,184 |

LNG supplies under a long-term sales and purchase agreement signed between Gazprom Marketing & Trading Singapore and Yamal Trade in 2015 started in May 2018. The agreement provides for the annual supply of 2.9 mm tonnes of LNG to Gazprom Group's trading portfolio from Russia's Yamal LNG project over 20 years (at a plateau), FOB Zeebrugge, Belgium.

LNG supplies from the Cameroon FLNG project were added to Gazprom Group's trading portfolio in June 2018 under a long-term agreement with Perenco Cameroon and Societe Nationale des Hydrocarbures for the annual supply of 1.2 mm tonnes of LNG over eight years.

For more details on Gazprom Group's LNG sales to different countries see Gazprom in Figures 2014–2018 Factbook

### Russian Gas Market

Gazprom is the largest natural gas supplier on the Russian market. Major buyers of Gazprom Group's natural gas are electricity generators, household consumers, and utilities. Moreover, the Group's natural gas is heavily used in the steelmaking, fertiliser, and cement industries, and other sectors of the national economy.

In 2018, Gazprom Group sold 239.7 bcm of gas to consumers in the Russian Federation, up by 9.8 bcm, or 4.3% year-on-year, primarily due to colder weather conditions in Q1 and Q4 2018. Gas supplies increased mainly to consumers in the energy and fertiliser industries, and the utilities sector. Net sales revenue was also driven by higher selling prices.

### Gas sales by Gazprom Group in Russia



Sales volumes, bcm

| 2016 | 214.9 |
|---|---|
| 2017 | 229.9 |
| 2018 | 239.7 |
| Change 2018/2017 | 4.3% |

Average selling price (net of VAT), RUB per mcm

| 2016 | 3,815.5 |
|---|---|
| 2017 | 3,808.3 |
| 2018 | 3,981.3 |
| Change 2018/2017 | 4.5% |

Net sales revenue (net of VAT), RUB bn

| 2016 | 819.9 |
|---|---|
| 2017 | 875.7 |
| 2018 | 954.5 |
| Change 2018/2017 | 9.0% |

For more details on Russian gas market trends see the Trends and Developments on Gas Markets section

In accordance with applicable Russian laws, end consumers buy gas at regulated prices which are differentiated between consumer groups (households vs industrial consumers), as well as by price zone, based on the relative distance from the gas production region to the consumer. In 2018, wholesale gas prices for subsequent resale to household consumers were 16% lower than wholesale gas prices for industrial consumers.