NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S., <br><br>                    Plaintiff, <br><br>        v. <br><br>UNITED STATES, <br><br>                    Defendant, <br><br>        and <br><br>REBAR TRADE ACTION COALITION, <br><br>                    Defendant-Intervenor. | Before: Hon. Gary S. Katzmann, <br>          Judge <br><br>Court No. 20-00065 <br><br>NON-CONFIDENTIAL VERSION <br><br>Business Proprietary Information Removed from Pages 2 and 6; Attachments 1 and 2 |

## DEFENDANT-INTERVENOR REBAR TRADE ACTION COALITION'S RESPONSES TO QUESTIONS FOR ORAL ARGUMENT

John R. Shane, Esq.
Maureen E. Thorson, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: April 27, 2021

## TABLE OF CONTENTS

                                                                                                             **Pages**

I. INTRODUCTION ...........................................................................................................1

II. RESPONSES TO QUESTIONS POSED TO RTAC AND THE UNITED STATES ...........................................................................................................................1

III. CONCLUSION ............................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)..................................................................................................................4

*Novosteel SA v. United States*,
    284 F.3d 1261 (Fed. Cir. 2002)................................................................................................10

*OTR Wheel Eng'g v. United States*,
    37 CIT 409, 901 F. Supp. 2d 1375 (2013)..................................................................................9

*Rebar Trade Action Coal. v. United States*,
    398 F. Supp. 3d 1374 (Ct. Int'l Trade 2019) ..............................................................3, 4, 8, 13

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006).................................................................................................10

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    413 F. Supp. 3d. 1347 (Ct. Int'l Trade 2019) ...................................................................3, 8, 13

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    459 F. Supp. 3d 1341 (Ct. Int'l Trade 2020) .....................................................................4, 8, 13

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
    277 F. Supp. 3d 1346 (Ct. Int'l Trade 2017) ........................................................................8, 13

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
    Consol. Ct. No. 19-00149, slip op. 2021-20 (Ct. Int'l Trade Feb. 19, 2021) ......................4, 13

**Regulations**

19 C.F.R. § 351.511(a)(2)(ii)..........................................................................................................8

19 C.F.R. § 351.511(a)(2)(iii).........................................................................................................8

**Administrative Materials**

*Steel Concrete Reinforcing Bar from the Republic of Turkey*, 84 Fed. Reg. 48,583
    (Dep't Commerce Sept. 16, 2019)...............................................................................2, 3, 6, 7

*Steel Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188
    (Dep't Commerce May 22, 2017)...............................................................................................7

*Steel Concrete Reinforcing Bar from Turkey*, 85 Fed. Reg. 16,056
 (Dep't Commerce Mar. 20, 2020)................................................................................... *passim*

**I.      INTRODUCTION**

Defendant-Intervenor Rebar Trade Action Coalition ("RTAC") respectfully submits the following responses to the Court's questions issued April 15, 2021. Specifically, RTAC responds to the questions that the Court posed equally to RTAC and to Defendant the United States.

**II.     RESPONSES TO QUESTIONS POSED TO RTAC AND THE UNITED STATES**

Below, RTAC reproduces and responds to each of the questions posed by the Court.

> 1. How do you respond to Habaş's argument that its statistical analysis of Russian export pricing, and conclusion that Russian export prices are in fact market-driven, meaningfully distinguishes this review from <u>Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of CVD Administrative Review; 2016</u>, 84 Fed. Reg. 36,051 (Dep't Commerce July 26, 2019)? <u>See</u> Reply Br. of Pl. at 17–18, Dec. 26, 2020, ECF No. 29 ("Pl.'s Reply Br."); <u>see also</u> Pl.'s Rule 56.2 Mot. for J. on the Agency R. at 31–32, Aug. 21, 2020, ECF No. 23 ("Pl.'s Br.").

Habas's statistical analysis amounts to a distinction without a difference. Habas's statistical analysis is flawed in two important respects, and thus provides no indication that Russian pricing to the European Union ("EU") or other export markets is market-based. First, Habas's statistical analysis is flawed because it involves a comparison of natural gas prices that are expressed solely on a kilogram basis, without reference to the energy content or volume of the underlying gas. Second, Habas's analysis is flawed because the pricing data that underlies it appears to reflect products other than natural gas in its gaseous, pipeline-transported form.

Habas purports to chart the average per-kilogram price at which Russian natural gas entered the EU against the average, per kilogram prices at which the EU imported gas from other large suppliers. Pl.'s Br. at 9-12. Habas argues that the Russian average price falls within the range of prices from other suppliers, and thus is necessarily market-based. *Id.* at 9-12, 32.

But Habas ignores the fact that it is impossible to properly compare natural gas prices that are presented only on a kilogram basis. As the Department of Commerce ("Commerce") explained,

natural gas is typically sold on an energy unit basis, not a weight basis, as one kilogram of natural gas does not uniformly equate to a certain energy unit (or even volume) of natural gas. Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from Turkey*, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) (final results of countervailing duty admin. rev.; 2017) ("Final IDM") at 19, 23-25, P.R. 143; Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 84 Fed. Reg. 48,583 (Dep't Commerce Sept. 16, 2019) (prelim. results of countervailing duty admin. rev.; 2017) ("Preliminary IDM") at 13, P.R. 106.

In fact, the relationship between weight and energy unit or volume varies with factors such as density and temperature. Final IDM at 23-25; Preliminary IDM at 13. Reflecting this, [


                                ]. Final IDM at 24; Preliminary IDM at 13; *see also* Letter from Law Offices of David L. Simon, PLLC to Sec'y of Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Habas natural gas benchmark submission* (Aug. 7, 2019) ("Habas Benchmark Submission") at Exhibit 1, C.R. 75-77, P.R. 76-78. The record contained evidence of even broader conversion ranges applicable across global trade in natural gas. Final IDM at 24; Preliminary IDM at 13. Because a kilogram of gas from one supplier may have a far different energy content, and thus value, than a kilogram of gas from another supplier, a comparison of weight-based prices cannot provide reliable evidence of whether Russian natural gas is priced in accordance with market principles. Preliminary IDM at 13; Final IDM at 26 (noting the "unique" issues presented by natural gas, for which there is no uniform conversion to a kilogram basis).

Beyond this, the data that Habas used for its analysis appears to reflect products other than natural gas in its gaseous, pipeline-transported form. For example, it reflects imports into the EU

2

from countries such as the United States, Canada, and New Zealand. Pl.'s Br. at 9. These are not countries that have natural gas pipeline connections with Europe. Habas Benchmark Submission at Exhibit 2, p. 8. It therefore appears that the dataset as a whole reflects not only imports of natural gas in its pipeline-transported form but other products, such as compressed natural gas ("CNG"). Notably, Commerce has previously refused to utilize pricing data that includes, or potentially includes, CNG as a benchmark for the price at which Turkish steel producers purchase natural gas from the Turkish Government. *See, e.g.*, *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 413 F. Supp. 3d. 1347, 1357 (Ct. Int'l Trade 2019) ("*Habas I*"); *Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d 1374, 1377, 1382 (Ct. Int'l Trade 2019).

Because Habas's statistical analysis is (1) based on an unreliable unit of measure and (2) based on a dataset that appears to be inclusive of pricing data for a product that is not relevant to the benchmarking exercise, that analysis does not meaningfully distinguish this case from prior cases in which Commerce confronted the question of how to benchmark Turkish steel producers' purchases of government-supplied natural gas. Rather, just as in those prior cases, Commerce reasonably and with the support of substantial record evidence determined not to rely on Russian pricing for natural gas exported to the EU.

2. *In determining whether there is political pricing of Russia's natural gas exports to the EU, should the focus be on the destination region or Russia's exports as a whole?*

In this case, the Russian pricing available for potential use as a benchmark relates to Russian gas imported into the EU. Thus, any distortions in Russian pricing to the EU take on a particular importance.[1] But with that said, the focus should be on whether substantial record

---

[1]  With respect to the Court's reference to the "destination region," it is not clear to RTAC whether the Court considers Turkey or Europe to be the destination region. Russian pricing to Turkey, however, is not on the record, and thus is not available for consideration as a potential benchmark price. But even if Russian natural gas pricing to Turkish consumers were on the record,

3

evidence – "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" – supports Commerce's conclusion that the Russian pricing data on the record does not furnish a market price for purposes of a tier-two or tier-three benchmark. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

The record here contains such evidence, which indicates both that Russian export natural gas pricing is distorted as a general matter, and that its pricing to the EU specifically is subject to and affected by this distortion. For example, the record contains a European Parliament report that indicates that Russia uses its energy wealth to "exert political pressure on end-consumers" generally, uses "restrictive contractual obligations" to "keep the European market fragmented," and prices the natural gas that it sells to EU countries so as to "invite{} political bargaining." Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Steel Concrete Reinforcing Bar from Turkey: RTAC's Rebuttal Benchmark Submission* (Aug. 19, 2019) ("RTAC Rebuttal Benchmark Submission") at Exhibit 3, pp. 4-5, P.R. 89-92.

Nor, as this Court has previously noted, is this the only proceeding in which Commerce has found that Russian natural gas pricing is distorted, and thus unsuitable for benchmarking purposes. Rather, "Commerce has consistently found that Russian natural gas export prices to the EU {are} distorted and unsuitable as a benchmark." *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, Consol. Ct. No. 19-00149, slip op. 2021-20 at 33 (Ct. Int'l Trade Feb. 19, 2021) ("*Icdas II*") (citing, as an example, *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirm. countervailing duty deter. and final negative critical circumstances

---

it could not be used as a benchmark price here. This is because all prices in Turkey are distorted by the Turkish Government's own dominant position in the Turkish gas market. Preliminary IDM at 9-10.

deter.)). Moreover, "the court has repeatedly sustained such findings." *Id.* The Court has done so in *Icdas II* and in *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 459 F. Supp. 3d 1341 (Ct. Int'l Trade 2020) ("*Habas II*"), as well as in *Rebar Trade Action Coalition*, 398 F. Supp. 3d at 1378. Thus, both the specific evidence on the record of this review and Commerce's consistent prior, affirmed findings support Commerce's determination here.

> a. How do you respond to Habaş's argument that the pricing of Russian exports to near-abroad countries has no bearing on the pricing of Russian exports to the EU? Pl.'s Br. at 30.

The substance of Habas's argument is that, while the record may indicate that Russian export pricing for natural gas is distorted as to "near-abroad" markets such as Ukraine, the record lacks substantial evidence to indicate that Russia's export prices outside of the "near-abroad" are anything but market-based. Pl.'s Br. at 30. This, however, is not the case. Indeed, one of the documents on which Habas relies as evidence of Russian pricing distortion in the "near-abroad" is a European Parliament report that indicates that Russia uses its energy wealth to "exert political pressure on end-consumers" generally, and is willing to "abuse its dominant market position in support of foreign policy goals" not only "in its immediate neighborhood but also further afield." RTAC Rebuttal Benchmark Submission at Exhibit 3, p. 4; *see also* Pl.'s Br. at 30 n.12.

For example, Russia uses "restrictive contractual obligations" to "keep the European market fragmented," and prices the natural gas that it sells to EU countries so as to "invite{} political bargaining." RTAC Rebuttal Benchmark Submission at Exhibit 3, p. 5. The report similarly notes that Russia "is the EU's most important external source of natural gas," and specifically outlines steps necessary for the EU to adequately resist Russian "energy coercion." *Id.* at Exhibit 3, pp. 4-5. Consider also that all natural gas exported from Russia is state-owned; only the country's state-owned natural gas company, Gazprom, has a right to export natural gas. This

means that both the supply and pricing of Russian natural gas to Europe (and elsewhere) is subject to Russian state control. *Id*. at Exhibit 6, pp. 3 & 13. Accordingly, the record evidence supports Commerce's conclusion that Russia leverages its natural gas exports "as a geopolitical tool . . . in Europe," and not solely in "near-abroad" markets. *Id*. at Exhibit 4; *see also* Final IDM at 23.

3. *Why did Commerce conclude it was preferable to rely on benchmark data employing an energy/volume unit rather than to convert Habaş's natural gas purchase data into kilograms, where the conversion rates are provided by the supplier's and pipeline carrier's invoices and the conversion methodology is therefore known?*

As an initial matter, [

]. Final IDM at 24; Preliminary IDM at 13; *see also* Habas Benchmark Submission at Exhibit 1. But even if Commerce had a reliable [

] method for converting Habas's natural gas purchases to a kilogram basis, Commerce would still have no way of knowing what method was used to convert the benchmark prices (to which Habas's prices are being compared) to a kilogram basis. Nor would Commerce know the underlying energy content or volume of the gas associated with those benchmark prices, for purposes of ensuring that the benchmark prices were for a product appropriately comparable to the gas that Habas purchased.

As Commerce explained, natural gas varies in its energy-content to weight ratio, such that one kilogram of gas from one supplier may be quite different, in terms of energy content, and thus value, from one kilogram of gas provided by another supplier. Final IDM at 19, 23-26; Preliminary IDM at 13. As a result, in the absence of information on the energy-content of the gas reflected in Habas's preferred sources of benchmark data, Commerce reasonably concluded that it could not be sure that it was comparing apples to apples. Final IDM at 24. This was not an issue with the IEA data that Commerce ultimately used as a benchmark, because it was reported in energy/volume units. *Id*. at 19.

Although Habas argued to Commerce that its preferred sources of benchmarking data were collected in "native" kilogram units, this does not dispel the problem. Letter from Law Offices of David L. Simon, PLLC to Sec'y of Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Habaş case brief* (Dec. 6, 2019) ("Habas's Case Brief") at 18-26, P.R. 131-132. It remains that, because of the highly variable energy content of natural gas, weight-based measures prevent apples-to-apples comparisons. Preliminary IDM at 13; Final IDM at 26 (noting the "unique" issues presented by natural gas, for which there is no uniform conversion to a kilogram basis); *see also* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) (final affirm. countervailing duty deter.) at 24 ("{G}iven that the record indicates shipments may vary by energy content, a calculation on the basis of weight or volume would not create an apples-to-apples comparison" (citation omitted)).

Beyond this, the record evidence to which Habas points in support of its contention regarding "native" kilogram units is not supportive of its claim. Habas points to nothing sourced from either the Comtrade or Eurostat import databases for its contention, but rather to an entirely separate Eurostat report on European energy imports, which presents data on a "net mass" basis. Pl.'s Br. at 26-27 (citing Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Steel Concrete Reinforcing Bar from Turkey: RTAC's Benchmark Submission* (Aug. 7, 2019) ("RTAC Benchmark Submission") at Exhibit 6, P.R. 79-81). But while the report presents data on this basis, it neither purports to explain the basis on which Eurostat (or Comtrade, for that matter) collect and report natural gas import data, much less the basis on which individual EU member countries do so. RTAC Benchmark Submission at Exhibit 6.

Finally, the fact that Habas's preferred source of benchmarking data appears to include prices for CNG further complicates Habas's position here. *See* discussion *supra* in response to Question 1.

4. *Is it your position that the collection and conversion issues that make the Comtrade and Eurostat data unsuitable for determining a tier-two benchmark similarly make these data unsuitable for determining a tier-three benchmark?*

Yes. In general, the difference between a tier-two and a tier-three benchmark is that a tier-two benchmark must correspond to a "world-market" price that is "available" to purchasers in the country under investigation, while the tier-three price need not be "available." *See, e.g.*, 19 C.F.R. § 351.511(a)(2)(ii)-(iii). Both types of benchmark share the requirement that they reflect market pricing and principles. *See, e.g.*, *Habas II*, 459 F. Supp. 3d at 1345.

However, they also share a requirement that is equally applicable to tier-one benchmarks: they must provide Commerce with the ability to compare prices on an apples-to-apples basis. For example, this Court has previously affirmed Commerce's determination not to benchmark prices paid for gaseous but non-condensed natural gas with prices that are inclusive of CNG. *See, e.g.*, *Habas I*, 413 F. Supp. 3d. at 1357; *Rebar Trade Action Coal.*, 398 F. Supp. 3d at 1377 & 1382. Likewise, this Court has previously affirmed Commerce's determination not to benchmark the price for a specific type of coal with the price for a different kind of coal. *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 277 F. Supp. 3d 1346, 1349-51 (Ct. Int'l Trade 2017) ("*Icdas I*").

In this case, Habas's preferred benchmark data is provided in a unit that, on its own, does not indicate the energy content or volume of the gas at issue. This made it impossible for Commerce to confirm whether the gas reflected in that data set was reasonably comparable with the gas purchased by Habas. Moreover, as noted above, the dataset appears to include CNG, a

product that Commerce has previously found non-comparable with the natural gas supplied by the Turkish Government. Accordingly, Habas's preferred benchmarking data does not conform with a fundamental requirement – that of allowing Commerce to compare the government price for a given product with a benchmark price for the same product.

> 5. *How do you respond to Habaş's argument that the use of data in annual figures may not accurately account for the volatility of natural gas prices? Pl.'s Br. at 38.*

Commerce generally prefers to use monthly data in its benchmarking exercises, as it acknowledged in its final decision here. Final IDM at 26. But the monthly data on the record here are not reliable, in that they reflected politically-distorted pricing, are expressed in a unit that has no uniform correlation with energy content, and moreover, appear to include pricing for CNG. Regardless of any volatility in natural gas pricing generally, the benchmarking data that Commerce uses must be reliable. Commerce reasonably determined that unreliable monthly data is not superior to reliable annual data. *Id.* Moreover, as Commerce noted, the annual data from the IEA does, in fact, "recognize{} the volatility of energy prices, as well as the importance of representativeness in data collection." *Id.* at 19. Habas's preferred data source may be monthly, but it is both unreliable and, as Commerce further noted, is unaccompanied by explanations regarding the data's collection or presentation. *Id.* at 26.

> a. *Assuming that monthly data better reflect this volatility, what record evidence or case law supports Commerce's decision to rely on the IEA data despite its general preference for monthly reporting?*

Again, Commerce reasonably found that unreliable data expressed on a monthly basis are not superior to reliable data that are expressed on an annual basis. Habas's monthly data are flawed due to the lack of any information regarding the energy content or volume of the gas underlying the data, *id.* at 24-25, and the fact that the dataset appears to be inclusive of pricing for CNG. Pl.'s Br. at 9. Moreover, the dataset is not accompanied by information that explains how it was

9

collected, how any conversions were performed, or what steps were taken to ensure data accuracy and reliability. Final IDM at 26. This stands in stark contrast with the IEA dataset, which was taken from a report that thoroughly detailed its collection and reporting methodologies. *Id.* at 19.

Commerce is entitled to weigh the record evidence, and, under the substantial evidence standard that applies to the agency's decisions, the Court is not entitled to re-weigh it. *See, e.g., OTR Wheel Eng'g v. United States*, 37 CIT 409, 414-15, 417, 901 F. Supp. 2d 1375, 1380, 1382 (2013). Here, Commerce considered the pros and cons of the datasets available to it for benchmarking purposes, and reasonably concluded that the IEA dataset offered superior reliability, and was thus a better choice overall, than monthly data that presented serious reliability concerns.

6. *How do you respond to Habaş's argument that Commerce could not have used the IEA data to determine a tier-three benchmark under 19 C.F.R. § 351.511(a)(2) because the data are inclusive of re-gasified liquid natural gas, and so are insufficiently similar to Habas's purchases of gaseous natural gas from Botas? Pl.'s Br. at 35–36; Pl.'s Reply Br. at 21.*

As an initial matter, Habas made no claim in its opening brief that the IEA data reflected "re-gasified liquid natural gas." Pl.'s Br. at 35-36. Rather, it argued that the IEA data reflected liquid natural gas, which it contrasted with "natural gas in its gaseous form." *Id*. In other words, Habas's argument was that the IEA data reflected trade in a liquid form of natural gas, not what Habas concedes, in its reply brief, is a re-gasified product that is "indistinguishable from {natural gas} imported in gaseous form." Pl.'s Reply Br. at 21. This court should consider any argument regarding re-gasified liquid natural gas therefore waived. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) ("{the} law is well established that arguments not raised in the opening brief are waived"); *Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (finding that an argument raised for the first time in reply brief was waived).

Nonetheless, even had Habas appropriately raised such an argument in its opening brief, it would be an extremely peculiar claim, as it in no way advances Habas's cause here. Habas concedes that "re{-}gasified LNG is indistinguishable from {natural gas} imported in gaseous form," because, once re-gasified, "it enters the distribution pipelines and is piped into customers' facilities indistinguishably from, and commingled with, {natural gas} imported in gaseous form." Pl.'s Reply Br. at 21. But this statement appears to apply not just to re-gasified natural gas generally, but to the natural gas that Habas purchases from Botas. To the extent that the natural gas that Botas supplies to Habas is likely to include re-gasified LNG, a dataset that is potentially inclusive of such gas would be more suitable as a benchmarking source – not less.

As Habas reported, it is "directly connected to the distribution gas pipeline" through which Botas provides natural gas. Letter from Law Offices of David L. Simon, PLLC to Sec'y of Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Habas questionnaire response* (Apr. 15, 2019) at 10, C.R. 6-17, P.R. 20.[2] Habas does not itself import any natural gas; rather, it reported its belief that "BOTAS imports natural gas." *Id.* at 10-11. Botas then "takes the title of the natural gas, and then transports the natural gas through its pipeline to Habas." *Id.* at 10.

The record data supplied by the Government of Turkey confirms that "BOTAS imports natural gas and does not produce it." Letter from Ministry of Trade, Directorate Gen. for Exports, Republic of Turkey, to Sec'y of Commerce, re: *First Administrative Review of Countervailing Duty Order on Steel Concrete Reinforcing Bar from Turkey: Questionnaire Response of the Government of Turkey* (Apr. 15, 2019) at 8, C.R. 18-44, P.R. 21-42.[3] All imported natural gas in

---

[2] While selections from Habas's April 15, 2019 questionnaire response are included in the joint appendix filed in this action, those selections do not include the pages cited here. RTAC is attaching the cited pages to this submission as **Attachment 1**.

[3] The joint appendix in this action does not include any selections from this document. RTAC is attaching the pages cited here as **Attachment 2** to this submission.

11

Turkey, moreover, is transported to buyers via Botas's pipelines, as it is the "only entity that can transmit natural gas inside Turkey." *Id.* at 17, 19. Crucially, this imported natural gas that Botas transmits to end users like Habas appears to include re-gasified LNG. *Id.* at 18 (noting that Botas transports gas that enters Turkey from the "M Ereglisi LNG Terminal") and Exhibit 2, pp. 18 & 22-23 (noting that the LNG terminal was put into operation in 1994 and processes LNG from Algeria and Nigeria). The record thus indicates that the natural gas that Habas purchases from Botas is likely a blend of commingled natural gas originally imported in gaseous form and re-gasified liquid natural gas. As such, Habas's claim that the IEA data reflects trade both in re-gasified natural gas and natural gas that has always been in gaseous form does not undermine Commerce's selection of the IEA data. Instead, it shows how uniquely suitable the IEA data are here.

> a. Did Commerce's adjustment of the IEA data to reflect the Russian market share adequately address Habaş's "similar product" concerns? Please provide any case law that supports your conclusion. Def.'s Br. at 15–16.

As noted in RTAC's briefs and above, Habas did not argue to Commerce that the IEA data reflected either LNG or re-gasified LNG. In its reply brief, Habas claims otherwise, noting a sentence in its case brief stating that "Commerce has repeatedly rejected the use of natural gas figures that might be distorted by the inclusion of liquid natural gas." Pl.'s Reply Br. at 21 (quoting Habas's Case Brief at 13). But this sentence is taken from a paragraph regarding how Commerce should use information entirely separate from the IEA data to adjust those data to account for Russian pricing. Habas's Case Brief at 12-13. It is not aimed in any way at the content of the IEA report itself. *Id.*

That said, in determining how best to account for the influence of Russian pricing on the IEA dataset, Commerce did take into account Habas's concern that the agency's preliminary

12

adjustment of the IEA dataset inappropriately took into account Russia's share of the EU market for both gaseous natural gas and LNG. *Compare id.* at 1-13, *with* Final IDM at 22. For the final results, Commerce relied on record evidence indicating that (1) approximately 16% of all natural gas imported into the EU is in liquid form and (2) Russia exports LNG only to East Asia to fine-tune its calculations so that they would be based on Russia's percentage of the EU market for gaseous natural gas only. Final IDM at 22. This adequately and reasonably addressed the "similar product" concerns that Habas advanced below. Again, these concerns were not aimed at the IEA dataset itself, but with ensuring that, in calculating Russia's share of the EU natural gas market, Commerce did not calculate Russia's share of the market for both gaseous natural gas and LNG, but only the Russian share of the market for the former product. *Compare* Habas's Case Brief at 1-13, *with* Final IDM at 22.

7. *What cases and authorities best support your argument?*

RTAC believes that the most pertinent and supportive authorities are as follows:

- *Icdas II*, CIT Slip Op. 2021-20;
- *Habas II*, 459 F. Supp. 3d 1341;
- *Habas I*, 413 F. Supp. 3d. 1347;
- *Rebar Trade Action Coal.*, 398 F. Supp. 3d 1374; and
- *Icdas I*, 277 F. Supp. 3d 1346.

8. *Are there any recent or pending Federal Circuit or CIT cases that may change the analysis?*

RTAC is not aware of any such cases, other than the cases noted in response to Question 7. These cases, however, do not change the analysis, but rather support the result that Commerce reached.

## III.  CONCLUSION

RTAC is hopeful that its responses will prove of value in the Court's consideration of this action and stands ready to respond to any further queries that the Court may pose at oral argument.

Respectfully submitted:

*/s/ John R. Shane*
John R. Shane, Esq.
Maureen E. Thorson, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: April 27, 2021

**CERTIFICATE OF COMPLIANCE**

Pursuant to the page limitation requirement set forth in the Court's questions issued April 15, 2021, the undersigned certifies that this submission complies with the page limitation requirement. The page count for Defendant-Intervenor Rebar Trade Action Coalition's Responses to Questions for Oral Argument, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 14 pages.

*/s/ John R. Shane*
(Signature of Attorney)

John R. Shane
(Name of Attorney)

Rebar Trade Action Coalition
(Representative Of)

April 27, 2021
(Date)