Slip Op. 21-100

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş.** | |
| **Plaintiff,** | |
| v. | **Before: Judge Gary S. Katzmann** |
| **UNITED STATES** | **Court No. 20-00065** |
| **Defendant,** | |
| **and** | |
| **REBAR TRADE ACTION COALITION,** | |
| **Defendant-Intervenor.** | |

## <u>OPINION</u>

[Plaintiff's Motion for Judgment on the Agency Record is denied, and Commerce's <u>Final Results</u> are sustained.]

Dated: <u>August 18, 2021</u>

<u>David L. Simon</u>, Law Office of David L. Simon, of Washington, D.C., argued for plaintiff.

<u>Ann C. Motto</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With her on the brief were <u>Jeffrey Bossert Clark</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director. Of Counsel <u>Reza Karamloo</u>, Senior Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

<u>Maureen E. Thorson</u>, Wiley Rein LLP, of Washington, D.C., argued for defendant-intervenor. With her on the brief were <u>John R. Shane</u>, <u>Stephanie M. Bell</u>, <u>Jeffrey O. Frank</u>, <u>Cynthia A. Galvez</u>, and <u>John Allen Riggins</u>.

Katzmann, Judge: This case involves a challenge to the Department of Commerce's

("Commerce") use of a tier-three benchmark in its determination of countervailing duties

("CVD"s) in the administrative review of steel concrete reinforcing bar ("rebar") from Turkey. Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 16,056 (Dep't Commerce Mar. 20, 2020) ("Final Results") PR 147.  Plaintiff Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. ("Habaş"), a Turkish rebar producer, specifically challenges Commerce's selection of a tier-three benchmark for Habaş's purchases of natural gas from Turkish government-owned entity Botaş.  Habaş argues that Commerce impermissibly rejected viable tier-two benchmarks, and that Commerce's ultimate calculation of a tier-three benchmark was arbitrary and capricious and unsupported by substantial evidence. Pl.'s Mot. for J. on the Agency R. 23–33, Aug. 21, 2020, ECF No. 23 ("Pl.'s Br.").  The court sustains Commerce's Final Results.

BACKGROUND

### I.    *Legal Background*

A countervailable subsidy exists when (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries.  19 U.S.C. § 1677(5).  To empower Commerce to offset economic distortions caused by countervailable subsidies, Congress promulgated the Tariff Act of 1930. Sioux Honey Ass'n v. Hartford Fire Ins., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); ATC Tires Private Ltd. v. United States, 42 CIT __, __, 322 F. Supp. 3d 1365, 1366 (2018).  The Tariff Act authorizes Commerce to investigate potential countervailable subsidies and, where such subsidies are identified, issue orders on the subject merchandise imposing duties equal to the net countervailable subsidies.  Sioux Honey, 672 F.3d at 1046–47; ATC Tires, 322 F. Supp. 3d at 1366–67; 19 U.S.C. §§ 1671, 1673.  Beginning on the anniversary of publication of a CVD order,

if Commerce has received a request for administrative review of that order, Commerce is required

to review and determine the amount of the countervailable subsidy at issue.   19 U.S.C.

§ 1675(a)(1).

In determining whether a benefit has been conferred upon the recipient of a financial

contribution under 19 U.S.C. § 1677(5), Commerce considers (among other factors) whether a

good or service has been provided to the recipient for less-than-adequate remuneration ("LTAR").

19 U.S.C. § 1677(5)(E)(iv); see also Nucor Corp. v. United States, 927 F.3d 1243, 1245 (Fed. Cir.

2019).  To identify such benefits,

> [T]he adequacy of remuneration shall be determined in relation to
> prevailing market conditions for the good or service being provided
> or the goods being purchased in the country which is subject to the
> investigation or review.  Prevailing market conditions include price,
> quality, availability, marketability, transportation, and other
> conditions of purchase or sale.

19 U.S.C. § 1677(5)(E)(iv).  In practice, Commerce determines if goods or services are being

provided for LTAR by conducting an analysis under 19 C.F.R. § 351.511.  See Nucor Corp., 927

F.3d at 1246; 19 C.F.R. § 351.511(a)(2).  Section 351.511 requires Commerce to follow a three-

tier analysis to identify a "suitable benchmark" that will be used to determine "the existence and

amount of a benefit conferred."  ArcelorMittal USA LLC v. United States, 42 CIT __, __, 337 F.

Supp. 3d 1285, 1291 (2018); see Essar Steel Ltd. v. United States, 678 F.3d 1268, 1273 (Fed. Cir.

2012) ("Commerce must determine the proper benchmark price in order to determine if the goods

were sold for 'less than adequate remuneration.'").  Typically, Commerce employs a tier-one

benchmark by measuring the government price of the good or service against a "market-

determined price" based on "actual transactions in the country in question."  19 C.F.R. §

351.511(a)(2)(i).  If "there is no useable market-determined price" available for comparison,

Commerce employs a tier-two benchmark by measuring the government price against a "world

market price" that is "available to purchasers in the country in question."  19 C.F.R. §
351.511(a)(2)(ii).  Where there is more than one commercially available world market price,
Commerce considers an average of the available world market prices.  Id.  If neither a market-
determined price nor a world market price is available, Commerce employs a tier-three benchmark
by evaluating whether the government price is "consistent with market principles."  19 C.F.R. §
351.511(a)(2)(iii); see POSCO v. United States, 977 F.3d 1369, 1372 (Fed. Cir. 2020).
Commerce's tier-three analysis considers "such factors as the government's price-setting
philosophy, costs (including rates of return sufficient to ensure future operations), or possible price
discrimination."  Countervailing Duties, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25,
1998).  These factors are not hierarchical in application, and Commerce may rely on one or more
factors to calculate a tier-three benchmark in any particular case.  Id.

## II.    Factual Background

On May 22, 2017 and July 14, 2017, respectively, Commerce published the CVD order
and amended CVD order on rebar from Turkey.  Steel Concrete Reinforcing Bar From the
Republic of Turkey: Final Affirmative Countervailing Duty Determ., 82 Fed. Reg. 23,188 (Dep't
Commerce May 22, 2017); Steel Concrete Reinforcing Bar From the Republic of Turkey: Am.
Final Affirmative Countervailing Duty Determ. and Countervailing Duty Order, 82 Fed. Reg.
32,531 (Dep't Commerce Jul. 14, 2017) (together, "Initial Orders").  Collectively, the Initial
Orders set out Commerce's determination that countervailable subsidies were being provided to
producers and exporters of Turkish rebar, and calculation of estimated net countervailable subsidy
rates for Habaş and other producers.

On July 3, 2018, Commerce published a notice of opportunity to request administrative
review of the Initial Orders for the period of March 1, 2017 through December 31, 2017.

<u>Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review</u>, 83 Fed. Reg. 31,121 (Dep't Commerce Jul. 3, 2018).  Habaş timely submitted a request for review, and Commerce published a notice initiating its review of Habaş's countervailable subsidy rates on September 10, 2018.  <u>Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review</u>, 83 Fed. Reg. 31,121 (Dep't Commerce Jul. 3, 2018).  At Commerce's request, Habaş and the Government of Turkey submitted questionnaire responses.  Section III Questionnaire Response of Habaş Sinai ve Tibbi Gazlar Istihsal Endüstri A.Ş. (Apr. 15, 2019), P.R. 20, C.R. 6–17; Letter from Ministry of Trade, Directorate Gen. for Exports, Republic of Turkey to Sec'y Commerce, re: First Administrative Review of Countervailing Duty Order on Steel Concrete Reinforcing Bar from Turkey: Questionnaire Response of the Government of Turkey 35 (Apr. 15, 2019), P.R. 21– 42, C.R. 18–44 ("Questionnaire Response of the Government of Turkey").  Rebar Trade Action Coalition ("RTAC") joined the administrative review initiated by Habaş as a petitioner, and on August 7, 2019, both Habaş and RTAC submitted benchmark proposals to Commerce.  Letter from Wiley Rein LLP to Dep't Commerce re RTAC Benchmark Submission, P.R. 79–81 ("RTAC Submission"); Letter from D.L. Simon to Dep't Commerce re Habaş Benchmark Submission ("Habaş Submission"), P.R. 76–79, C.R. 75–77.  In relevant part, Habaş's benchmark submission provided data from the United Nations Comtrade database on natural gas purchase prices in dollars per kilogram, and proposed conversion factors for the conversion of Habaş' natural gas purchases from cubic meters and kilowatt hours to kilograms.  Habaş Submission at 2–3.  Habaş's submission also requested that Commerce employ the Comtrade data to calculate a tier-two benchmark based on Russian natural gas prices and included additional data in support of Habaş's contention that Russian natural gas prices are market-driven, not politically determined, and are thus appropriate

for benchmark calculation.  Id. at 3–7.  RTAC's benchmark submission provided natural gas price

data from the IEA, along with source documentation and additional natural gas import data from

Eurostat, and requested that Commerce employ the IEA data in its benchmark calculations.  RTAC

Submission at 1–2.  Both Habaş and RTAC subsequently submitted benchmark rebuttals.  Letter

from Wiley Rein LLP to Sec'y. of Commerce, re Steel Concrete Reinforcing Bar from Turkey:

RTAC's Rebuttal Benchmark Submission (Aug. 19, 2019), P.R. 89–92 ("RTAC's Rebuttal

Benchmark Submission"); Letter from D.L. Simon to Dep't Commerce re Habaş Benchmark

Rebuttal (Aug. 19, 2019), P.R. 88.

In September of 2019, Commerce issued its preliminary results of administrative review.

Steel Concrete Reinforcing Bar From the Republic of Turkey: Prelim. Results of Countervailing

Duty Administrative Review; 2017, 84 Fed. Reg. 48,583 (Dep't Commerce Sept. 16, 2019), P.R.

115 ("Preliminary Results"); see also Mem. from J. Maeder to J. Kessler re Decision Mem. for the

Prelim. Results of the Countervailing Duty Administrative Review: Steel Concrete Reinforcing

Bar from the Republic of Turkey; 2017 (Dep't Commerce Sept. 6, 2019), P.R. 106 ("PDM").  In

the Preliminary Results and accompanying Preliminary Decision Memorandum, Commerce

preliminarily determined that Habaş had been receiving countervailable subsidies through the

purchase of natural gas from Botaş, a state-owned natural gas company.  Preliminary Results at

48,583; PDM at 8.  In making its determination, Commerce undertook an LTAR analysis of

Habaş's natural gas purchases from Botaş pursuant to 19 C.F.R. 351.511(a)(2)(ii) and

preliminarily found, consistent with its prior determinations, that (1) the only applicable tier-two

benchmark price for natural gas in Turkey is the price valid in countries "'connected to Turkey

through natural gas pipelines' (i.e. Russia, Azerbaijan, and Iran)" and (2) natural gas prices from

Russia, proposed by Habaş as a tier-two benchmark, are distorted and therefore unsuitable for the

construction of a natural gas benchmark.[1]  PDM at 10–11 (quoting <u>Steel Concrete Reinforcing Bar</u>

<u>From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review</u>

<u>and Intent To Rescind the Review in Part; 2016</u>, 83 Fed. Reg. 63,472 (Dep't Commerce Dec. 10,

2018), and accompanying Preliminary Decision Memorandum at 23).  Accordingly, Commerce

concluded that no viable tier-two benchmarks were available on the record.  <u>Id.</u> at 12.  Next,

Commerce preliminarily found the Comtrade data submitted by Habaş to be unreliable, and

therefore unsuitable for the calculation of a tier-three natural gas benchmark.  <u>Id.</u> at 13.  In

particular, Commerce explained that the Comtrade data were not accompanied by an underlying

document explaining the reporting, collection, and conversion of the data; that use of the Comtrade

data would require conversion of Habaş's own natural gas purchase data; and that the Comtrade

data were inconsistent with other data on the record.  <u>Id.</u>  Commerce therefore rejected the

Comtrade data submitted by Habaş and calculated a preliminary tier-three benchmark using the

IEA data submitted by RTAC.

     In March of 2020, Commerce issued its final results of administrative review, which

determined that Habaş received countervailable subsidies and reiterated the findings of the

<u>Preliminary Results</u>.  <u>Final Results</u>.[2]  In the accompanying Issues and Decision Memorandum,

Commerce concluded that the IEA data submitted by RTAC are "accurate and reliable, and

---

[1] Commerce further noted in its PDM that neither Azerbaijani nor Iranian natural gas prices were proposed during the course of the review as alternative tier-two benchmarks (whether by RTAC or Habaş) and that Azerbaijani natural gas prices had "previously [been] found to be unusable for benchmark purposes."  PDM at 11.

[2] A correction to the <u>Final Results</u> was subsequently issued, clarifying that the countervailable subsidy rate set out in the <u>Final Results</u> is applicable to both Habaş and its cross-owned companies. <u>Steel Concrete Reinforcing Bar From the Republic of Turkey: Correction to Final Results of Countervailing Duty Administrative Review; 2017</u>, 85 Fed. Reg. 20,665 (Dep't Commerce Apr. 14, 2020).  For purposes of this opinion, "<u>Final Results</u>" refers to Commerce's final determination in toto, including the subsequent correction.

otherwise free of methodological uncertainty," and rejected Habaş's arguments to the contrary. Mem. to J. Kessler from J. Maeder re Issues and Decision Mem. for the Final Results of Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Turkey; 2017 14 (Dep't Commerce Mar. 13, 2020), P.R. 143 ("IDM"). Commerce further concluded, in line with the PDM and Preliminary Results, that the Comtrade data provided by Habaş are unreliable, and that Russian natural gas prices are distorted and cannot be used as a benchmark. IDM at 17–18.

### III.    Procedural History

On March 26, 2020, Habaş initiated the instant case. Summons, ECF No. 1. The following day, Habaş timely filed a complaint challenging Commerce's Final Results. Compl., Mar. 27, 2020, ECF No. 10. The complaint alleged three specific objections to the Final Results: first, that Commerce's use of International Energy Agency ("IEA") tables as a benchmark for Habaş's natural gas purchase prices was unsupported by the record or otherwise unlawful; second, that Commerce's rejection of European Union ("EU") natural gas import prices from Russia as a tier-two or -three benchmark was unsupported by the record or otherwise unlawful; and three, that Commerce's rejection of EU natural gas import prices from Norway, Algeria, Libya, and Ukraine as a tier-two or -three benchmark was unsupported by the record or otherwise unlawful. Compl. at 5. On April 2, 2020, RTAC joined the action as Defendant-Intervenor. Order Granting Mot. to Intervene as Def.-Inter., ECF No. 18. On August 21, 2020, Habaş filed a motion for judgment on the agency record. Pl.'s Br. The United States ("Government") filed a response on November 10, 2020, and RTAC filed a response on November 11, 2020. Resp. to Mot. for J. on Agency R., ECF No. 26 ("Def.'s Br."); Conf. Resp. to Mot. for J. on Agency R., ECF No. 27; Def.-Inter.'s Resp. to Mot. for J. on Agency R., ECF No. 28 ("Def.-Inter.'s Br."). On December 26, 2020, Habaş filed

its reply brief.  Reply Br. of Pl. ECF No. 29 ("Pl.'s Reply").  On April 27, 2021, at the request of

the court, the parties filed supplemental briefs prior to oral argument.  Conf. Resp. of Pl. to Court's

Letter of Apr. 15, ECF No. 36; Resp. of Pl. to Court's Letter of Apr. 15, ECF No. 37; Def.'s Resp.

to Court's Apr. 15 Order, ECF No. 38; Def.-Inter.'s Resps. to Questions for Oral Arg., Conf., ECF

No. 39; Def.-Inter.'s Resps. to Questions for Oral Arg., ECF No. 40.  Oral argument was held on

May 19, 2021. Oral Arg., ECF No. 41.  Habaş and RTAC each filed post-argument briefs on May

26, 2021.  Cmts. of Pl. Following Oral Arg., ECF No. 42; Post-Arg. Submission of Def.-Inter.,

Conf., ECF No. 43; Post-Arg. Submission of Def.-Inter., ECF No. 44.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(ii).  The standard of review in this action is set forth in 19

U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  See also N.M. Garlic Growers Coal. v. United States, 953 F.3d 1358, 1368

(Fed. Cir. 2020).  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Nippon Steel Corp. v. United States, 337 F.3d 1373,

1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 299 (1938)).  Support

from substantial evidence is satisfied by "less than the weight of the evidence but more than a mere

scintilla of evidence."  Elbit Systems of America, LLC v. Thales Visionix, Inc., 881 F.3d 1354,

1356 (Fed. Cir. 2018) (quoting In re Nuvasive, Inc., 842 F.3d 1376, 1379 (Fed. Cir. 2016)).  "[T]he

possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence."  AK Steel Corp.

v. United States, 192 F.3d 1367, 1371 (Fed. Cir. 1999) (alteration in original) (quoting Consolo v.

Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).  Rather, for the court to sustain the <u>Final Results</u>,

Commerce must simply demonstrate a "rational connection between the facts found and the choice

made." <u>Nucor Corp. v. United States</u>, 32 CIT 1380, 1384, 594 F. Supp. 2d 1320, 1331–32 (2008)

(quoting <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962)).

## DISCUSSION

As set out above, Habaş argues that Commerce's <u>Final Results</u> are unsupported by

substantial evidence and not in accordance with law because (1) Commerce wrongly rejected the

Comtrade data on natural gas imports from Russia in calculating a tier-two benchmark for Habaş's

natural gas purchase prices; (2) Commerce similarly wrongly rejected the Eurostat data on natural

gas imports from Russia in calculating a tier-two benchmark; and (3) Commerce wrongly rejected

the Eurostat data on natural gas import prices from Norway, Algeria, Libya, and Ukraine in

calculating a tier-three benchmark.  Compl. at 5.  The court finds that, contrary to Habaş's

allegations, Commerce's <u>Final Results</u> are supported by substantial evidence and in accordance

with law.

### I.      *Commerce Reasonably Determined There Were No Data on the Record Suitable for the Calculation of a Tier-Two Benchmark.*

Where the record cannot support calculation of a tier-one benchmark, Commerce is

permitted to employ a tier-two benchmark in its LTAR analysis.  19 C.F.R. § 351.511(a)(2)(i)–

(ii).  To calculate a tier-two benchmark, Commerce must rely on a world market price that is both

"available to purchasers in the country in question," pursuant to 19 C.F.R. § 351.511(a)(2)(ii), and

reliable based on the evidence in the record. [3]  <u>See</u> <u>QVD Food Co. Ltd. v. United States</u>, 658 F.3d

---

[3] It is undisputed that Commerce could not determine a tier-one benchmark based on the evidence on the record.  <u>See</u> Pl.'s Br. at 5 ("[T]he parties agree that there is no tier-one benchmark."); Def.'s Br. at 8 ("[Habaş] does not challenge Commerce's finding that there were no usable tier-one

1318, 1325–26 (Fed. Cir. 2011) (sustaining Commerce's decision to reject appellant's more recent

financial statements because evidence on the record "undermined the reliability of the data"); see

also Archer Daniels Midland Co. v. United States, 37 CIT 760, 770–71, 917 F. Supp. 2d 1331,

1343 (2013) (upholding Commerce's decision to utilize tier-two prices when reliable tier-one

prices are unavailable).  For a tier-two benchmark to be sustained by the court, it must be supported

by sufficient evidence for there to be a reasonable connection between the evidence in the record

and Commerce's conclusion.  See Nippon Steel Corp., 337 F.3d at 1379.

Habaş alleges that the evidence on the record was adequate for the calculation of a tier-two

benchmark, and that Commerce was therefore obligated, pursuant to 19 C.F.R. § 351.511(a)(2)(ii),

to employ a tier-two benchmark in its LTAR analysis.  Pl.'s Br. at 5.  Habaş specifically argues

that Commerce erred by rejecting its proffered Comtrade data, and by failing to consider the

Eurostat data also on the record as a potential tier-two benchmark.  Id.  The Government and

RTAC respond that Commerce permissibly rejected the Comtrade and Eurostat data, and

reasonably determined that there were no viable tier-two benchmarks available for its LTAR

analysis.  Def.'s Br. at 6–7; Def.-Inter.'s Br. at 4, 8–9.  The court concludes that Commerce's

determination, and its rejection of the Comtrade and Eurostat data, was supported by substantial

evidence and in accordance with law.

### A.   *Commerce Reasonably Determined that the Comtrade Data Are Unsuitable for the Calculation of a Tier-Two Benchmark.*

Commerce rejected Habaş's Comtrade submission as unreliable for three reasons.  First,

Commerce noted that "there is no explanation of the methodology used to calculate the

COMTRADE data or the methodology the original sources (i.e., each country) used to collect the

---

prices.") (citing Pl.'s Br. at 5).  The court therefore only considers the parties' arguments regarding
the calculation of tier-two and tier-three benchmarks.

data." IDM at 24.  This includes whether the data were in fact initially collected in kilograms or whether they were converted post hac, thereby risking varying conversion amounts due to temperature and density factors.  Id.  Second, Commerce explained that, because the Comtrade data are reported in kilograms and Habaş's own data are reported in a price per unit of energy basis, using the Comtrade data in an LTAR analysis would require conversion and would further risk varying conversion amounts.  Id.  Finally, Commerce noted that the Comtrade data were distorted by the inclusion of Russian export prices, which are themselves distorted by the Government of Russia's "monopoly over the sales and distribution of natural gas" domestically, and its "position as a dominant supplier in the international market, which enables it to leverage natural gas prices and supplies for geopolitical purposes."  Id. at 25 (citing Steel Concrete Reinforcing Bar From the Republic of Turkey; 2016, 83 Fed. Reg. 63,472, and accompanying Preliminary Decision Memorandum at 22).

Commerce's rejection of the Comtrade data is supported by substantial evidence and in accordance with law.  First addressing Commerce's collection methodology and conversion-factor concerns, the court concludes that Commerce reasonably determined that the data were unreliable for purposes of an LTAR analysis.  Commerce is correct that the record provides no explanation of the initial collection and conversion of the Comtrade data.  IDM at 24; Def.'s Br. at 11.  Despite Habaş's assertions to the contrary, the court agrees with the Government and RTAC that the explanatory documentation accompanying the Eurostat data cannot be imputed wholesale to the Comtrade data without more evidence, and without an explanation of the various discrepancies between the two datasets.  Pl.'s Br. at 26–28; Def.'s Br. at 12; Def.-Inter.'s Br. at 9–10.  Nor is the court persuaded by Habaş's argument that Commerce has previously employed Comtrade data in its investigations regarding non-natural gas products, and should therefore do so here: rather, "each

administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1387 (Fed. Cir. 2014); see also Def.'s Br. at 12. Here, Commerce has reasonably differentiated its review by explaining that an understanding of data-reporting and conversion methodology is "particularly important for a good such as natural gas, where conversion rates can vary based on factors such as pressure and temperature." IDM at 24. Given that there is no evidence in the record regarding the collection or reporting of the Comtrade data, and that Commerce has clearly explained its reasons for requiring documentation of the collection and conversion of any tier-two benchmark data, the court concludes that "the record adequately supports" Commerce's decision that the Comtrade data were unreliable. Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL–CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993); see also Def.'s Br. at 11; IDM at 24.

Even if Commerce's collection methodology and conversion-factor concerns were not adequate basis for its rejection of the Comtrade data, its determination that the data were unreliable due to distortion by Russian natural gas export prices is supported by substantial evidence and in accordance with law. Commerce's decision to reject Russian pricing data is supported by the record: in its rebuttal benchmark submission, RTAC provided evidence of Russian price distortion in the form of a study from the European Parliament and a collection of additional publications. See RTAC's Rebuttal Benchmark Submission at Exhibits 3–10. Commerce explicitly weighed RTAC's submissions against the evidence submitted by Habaş and determined that "due to the [Government of Russia's] practice of distorting the natural gas market for its own geopolitical purposes, Russian export prices are unsuitable for use in constructing" a tier-two benchmark. IDM at 25–26. Furthermore, as the Government notes, the court has previously sustained Commerce's

decision to reject Russian natural gas prices for the purposes of benchmark calculation because the

Russian prices were distorted by the Russian Government's political pricing.  IDM at 25; Def.'s

Br. at 8–9 ("This Court has previously sustained Commerce's decision to reject using Russian

natural gas prices as a benchmark because those figures were distorted." (first citing Rebar Trade

Action Coal. v. United States, 43 CIT __, __, 398 F. Supp. 3d 1374, 1378–79 (2019) ("RTAC");

and then citing Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States, 44 CIT __,

__, 459 F. Supp. 3d 1341, 1347–49 (2020) ("Habaş"))).  Given the foregoing, the court concludes

that Commerce's rejection of the Comtrade data for purposes of calculating a tier-two LTAR

benchmark is supported by substantial evidence and in accordance with law.

> **B.**     ***Commerce Reasonably Determined that the Eurostat Data Are***
> ***Unsuitable for the Calculation of a Tier-Two Benchmark.***

Commerce rejected the Eurostat data for largely the same reasons it rejected the Comtrade

data.  First, Commerce noted that there is no record evidence suggesting the Eurostat data are

unconverted (i.e., reported natively in kilograms), and there is therefore a risk of varying

conversion factors both in the potential conversion of the initial data to kilograms, and in the

conversion of the collected data to price per unit of energy for the LTAR analysis.  IDM at 24.

Second, Commerce determined that the Eurostat data were distorted by the inclusion of distorted

Russian export pricing data.  Def.'s Br. at 9, PDM at 11–12; IDM at 25–26.

The court concludes that Commerce's rejection of the Eurostat data for purposes of

calculation of a tier-two benchmark is supported by substantial evidence and in accordance with

law.  As noted above, Commerce adequately explained its determination that data requiring

conversion is unsuitable for investigation of the provision of natural gas for LTAR.  IDM at 24.

Furthermore, Commerce's determination that Russian pricing data are distorted by the

manipulation of the Russian government is supported by evidence on the record and in line both

with prior determinations by Commerce and with prior decisions of the court.  IDM at 25; Def.'s

Br. at 8–9; <u>RTAC</u>, 398 F. Supp. 3d at 1378-79; <u>Habaş</u>, 459 F. Supp. 3d at 1347-49.

  Nor is the court persuaded by Habaş's argument that Commerce failed to consider the

Eurostat data as a potential tier-two benchmark.  Pl.'s Br. at 22, 28.  Commerce explicitly

considered "the suitability of COMTRADE and Eurostat data" in the Issues and Decision

Memorandum accompanying its <u>Final Results</u>.  IDM at 23.  Commerce nevertheless rejected the

data after determining it was unsuitable for the calculation of a tier-two benchmark for the reasons

described above.  Accordingly, the court concludes that Commerce's rejection of the Eurostat data

is supported by substantial evidence and in accordance with law.

  ***II. Commerce's Calculation of a Tier-Three Benchmark Using the IEA Data Was Supported by Substantial Evidence and In Accordance With Law.***

  Where the record cannot support calculation of a tier-two benchmark, Commerce is

permitted to employ a tier-three benchmark in its LTAR analysis.  19 C.F.R. § 351.511(a)(2)(ii)–

(iii).  To calculate a tier-three benchmark, Commerce "measure[s] the adequacy of remuneration

by assessing whether the government price is consistent with market principles."  19 C.F.R. §

351.511(a)(2)(iii).  For a tier-three benchmark to be sustained by the court, it must be supported

by "such relevant evidence as a reasonable mind might accept as adequate to support

[Commerce's] conclusion." <u>Nippon Steel Corp.</u>, 337 F.3d at 1379 (quoting <u>Consol. Edison Co.</u>,

305 U.S. at 299).

  Habaş alleges that, even if it were appropriate for Commerce to employ a tier-three

benchmark, Commerce's selection of a tier-three benchmark was unsupported by substantial

evidence and not in accordance with law.  Pl.'s Br. at 33.  Habaş first argues that Commerce erred

by failing to consider Eurostat data for countries other than Russia (namely, Algeria, Libya,

Norway and Ukraine) as a potential tier-three benchmark.[4]  Id. at 34.  Habaş then argues that the

IEA data are fatally flawed because they are "not restricted to natural gas in its gaseous form, but,

rather, encompass liquid natural gas as well" and are therefore not comparable to Habaş's

purchases of gaseous natural gas.  Id. at 35.  Finally, Habaş argues that the "multitude of

adjustments that Commerce had to make to the IEA figures," along with its annual reporting,

render the IEA data unsuitable for benchmark calculation.  Id. at 38.  The Government and RTAC

respond that Commerce permissibly rejected the Eurostat data for purposes of tier-three

benchmark calculation because of the conversion issues inherent in that data.  Def.'s Br. at 15;

Def.-Inter.'s Br. at 15.  The Government further responds that Commerce explicitly adjusted the

IEA data to include only gaseous natural gas prices.  Def.'s Br. at 16.   RTAC also notes that

Habaş's own natural gas purchases are comparable to the natural gas purchases recorded by the

IEA data.  Post-Arg. Submission of Def.-Inter. at 1.  Finally, the Government and RTAC respond

that the adjustments Commerce made to the IEA data were reasonable and increased the overall

accuracy of the data, and that the more-frequent reporting of the Comtrade and Eurostat data cannot

outweigh their overall unreliability.  Def.'s Br. at 16–17; Def.-Inter's Br. at 16–17.  The court

concludes that Commerce's reliance on the IEA data for the calculation of a tier-three benchmark,

and its rejection of the non-Russian Eurostat data, was supported by substantial evidence and in

accordance with law.

      For the same reasons set out above, Commerce reasonably found that the Eurostat data

(and indeed, the Comtrade data) were unsuitable for the calculation of a tier-three benchmark.  The

record clearly shows that Commerce determined that both the Comtrade and Eurostat data were

---

[4] Although Habaş further argues that Eurostat's Russian import pricing data could provide a viable tier-three benchmark, the court rejects this argument for the reasons set forth in Section I and declines to further discuss Russian pricing data here.  See, e.g., Pl.'s Br. at 22.

unreliable because the conversion from kilograms to price per energy units risks varying conversion amounts due to temperature and density factors.  IDM at 24–25; Def.'s Br. at 15; Def.-Inter.'s Br. at 15.  The Comtrade data, although not emphasized as a potential tier-three benchmark in Habaş's briefing, is further unsuitable because there is no explanation on the record of data the collection methodology employed by the participating countries.  See IDM at 24; Def.'s Br. at 11. As the court has previously stated, "Commerce must justify why the data set it chooses is appropriate" -- and Commerce has explicitly done so here.  Dorbest Ltd. v. United States, 30 CIT 1671, 1717, 462 F. Supp. 2d 1262, 1302 (2006).  Therefore, regardless of whether Commerce were to consider Russian export pricing data or data sourced from EU natural gas imports from Algeria, Libya, Norway and Ukraine, the court concludes that Commerce's rejection of the Comtrade and Eurostat data for purposes of tier-three benchmark calculation is supported by substantial evidence and in accordance with law.

Commerce's use of the IEA data to calculate a tier-three benchmark is also supported by substantial evidence and in accordance with law.  Contrary to Habaş's assertions, there is no evidence that Commerce failed to consider (and adjust for) the IEA dataset's inclusion of liquid natural gas pricing data as well as gaseous natural gas pricing data.  Rather, the IEA data Commerce relied upon for purposes of its tier-three benchmark calculation included only "end-use" pricing data: in other words, data regarding the sale price of natural gas when it is sold to ultimate consumers.  IDM at 19; Def.'s Br. at 15–16.  As the Government notes in its brief, "liquefied natural gas is not a product purchased by companies and households for their own energy consumption purposes," -- thus, liquefied natural gas is inherently excluded from the IEA data considered by Commerce in its tier-three benchmark calculation.  Def.'s Br. at 16.

Habaş further argues that the end-use, gaseous natural gas is comprised of both gaseous natural gas imports and re-gasified liquid natural gas imports and is therefore unsuitable for comparison purposes under 19 C.F.R. § 351.511(a)(2)(iii).  However, there is no clear regulatory requirement that Commerce consider "product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability," as in a tier-one analysis, or "[make] due allowance for factors affecting comparability," as in a tier-two analysis, for purposes of its tier-three analysis. 19 C.F.R. § 351.511(a)(2)(i)–(ii).  Rather, Commerce is only expressly required by 19 C.F.R. § 351.511 to consider price comparability when conducting a tier-one or tier-two analysis.  Id.  In any case, even if such requirement were imputed to Commerce's tier-three analysis, it is likely satisfied here.  The Government of Turkey acknowledged in its submissions to Commerce that Botaş provides end-use consumers with a commingled product of gaseous and re-gasified natural gas.  Questionnaire Response of the Government of Turkey at 35; Post-Arg. Submission of Def.-Inter. at 1, 12.  Habaş's purchase data and the IEA pricing data therefore relate to directly comparable products.  Accordingly, the court reject's Habaş's assertions that by calculating a tier-three benchmark based on the IEA data, Commerce failed to comply with the comparability requirements of 19 C.F.R. § 351.511.

Nor is the court persuaded by Habaş's arguments that the IEA data are insufficiently accurate.  Pl.'s Br. at 38.  Habaş asserts that Commerce's adjustments to the IEA data, among them "indexing, averaging between values for industrial users and electricity generators, [and] constructing a framework to 'eliminate' the impact of Russian figures from the data, etc." render the data unreliable for a tier-three determination because "[e]ach of these adjustments introduces an approximation into the benchmark, taking it further away from empirical accuracy."  Id. at 38–39.  Habaş further argues that the annually-reported IEA data fails to comply with Commerce's

stated preference for monthly data, and therefore fail to account for the volatility of the energy market.  Id.; IDM at 26.  Habaş concludes that the IEA data are inaccurate and unsuitable for the calculation of a tier-three benchmark.  Pl.'s Br. at 38.  These arguments are unavailing because, as Commerce explained, "the best available information [on the record] is in the IEA report."  IDM at 26.  Specifically, Commerce concluded that the IEA data were the most reliable data on the record because the Comtrade and Eurostat data required the conversion of kilograms to price per energy units whereas the adjustments required by the IEA data involved no conversions, and because the IEA expressly recognizes volatility concerns.  IDM at 19.  Commerce further stated that its preference for monthly data was "superseded by the need to select the best available information on the record for purposes of determining a benchmark."[5]  IDM at 26.  Commerce has therefore provided a reasonable explanation for its reliance on the IEA data, and despite Habaş's disagreement, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  AK Steel Corp., 192 F.3d at 1371.  Accordingly, given its conclusion that the other data on the record were unsuitable for the calculation of a tier-three benchmark, the court concludes that Commerce reasonably relied upon the IEA data in calculating a tier-three benchmark.

**CONCLUSION**

Based on the evidence in the record, Commerce reasonably rejected the Comtrade and Eurostat data on natural gas imports from Russia in calculating a tier-two benchmark for its LTAR

---

[5] Nor is Commerce precluded from relying on annual benchmarks.  Def.'s Br. at 17; Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Affirmative Countervailing Duty Determination, 82 Fed. Reg. 23,188 (Dep't Commerce May 15, 2017) and accompanying Issues and Decision Memorandum; see also Rebar Trade Action Coal. v. United States, 43 CIT __, __, 389 F. Supp. 3d 1371, 1383 (2019), aff'd, Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States, 992 F.3d 1348 (Fed. Cir. 2021)).

Court No. 20-00065                                                                           Page 20

analysis of Habaş's natural gas purchase prices, reasonably rejected the Eurostat natural gas import

data from Norway, Algeria, Libya, and Ukraine in calculating a tier-three benchmark, and

reasonably relied upon the IEA data in calculating its ultimate tier-three benchmark.   For the

foregoing reasons, Commerce's <u>Final Determination</u> is sustained.

      **<u>SO ORDERED.</u>**

<u>/s/   Gary S. Katzmann</u>
Gary S. Katzmann, Judge

Dated:  <u>August 18, 2021</u>
       New York, New York